[No. H005056. Sixth Dist. May 30, 1991.]

GLADYS STALBERG et al., Plaintiffs and Respondents, v.
WESTERN TITLE INSURANCE COMPANY, Defendant and Appellant.

ROBERT WREDE et al., Plaintiffs and Respondents, v.
WESTERN TITLE INSURANCE COMPANY, Defendant and Appellant.

**COUNSEL**

James L. Stoelker, Atwood, Knox & Anderson, Stanford H. Atwood, Jr., and Peter Uzzi for Defendant and Appellant.

Louis A. Highman and Bruce J. Highman for Plaintiffs and Respondents.

**OPINION**

**CAPACCIOLI, J.**—Defendant Western Title Insurance Company (Western) appeals the judgment in plaintiffs' favor entered on a jury verdict. Western assigns multiple errors. Western contends that all of plaintiffs' causes of action are barred by the applicable statutes of limitations. (Code Civ.

Proc.,[1] §§ 337, Former 338, subds. 1 & 7, 339, subd. 1, 343.) Western contends the trial court committed instructional error, and that substantial evidence does not support the verdict on any cause of action. We conclude there was instructional error, and affirm in part and reverse in part.

*Facts and Procedural Background*

This lawsuit grew out of a prior lawsuit settling the rights of Casa Loma residents to an easement in a road. The Casa Loma area is a rural, ecologically sensitive part of Santa Clara County located in the foothills of the Santa Cruz Mountains west of Morgan Hill, between San Jose and Gilroy. The road affording the only ingress and egress for upstream landowners near Twin Falls Creek follows along that creek, at and above its confluence with Llagas Creek. The narrow dirt road, variable in width but at most 10 feet wide, runs beside the creek. (See *Thomson* v. *Dypvik* (1985) 174 Cal.App.3d 329, 332-333 [220 Cal.Rptr. 46].)

Plaintiffs in this case own land at the lower reaches of Twin Falls Creek and are Gladys Stalberg, Robert and Maudie Thomson (Thomson), and Robert and Jeanne Wrede (Wrede). Stalberg acquired title in 1961. Thomson acquired title in 1964 and to a second parcel in 1966. Wrede acquired title in 1969. Western was the escrow holder and title insurer for Stalberg, Thomson and Wrede.

Upstream landowner Harry Harris purchased 400 acres from the Abinante family in 1959. Harris always used the road along the creek and over the lands later owned by Stalberg, Thomson and Wrede to get to his property. In 1963 Harris divided his land into four parcels. Over the next 20 years Harris's 4 parcels changed hands a number of times. Western handled only six of the escrows for those conveyances of title.

In 1964 Harris conveyed one parcel to Harper, who conveyed a portion of it to Wilson the same day. Western conducted both escrows. Western prepared the deeds which provided: "A nonexclusive easement for ingress and egress and the installation and maintenance of public utilities over a strip of land 60 feet wide, the centerline of which is the centerline of the now-existing road. . ." Western recorded these deeds and explicitly declined to insure the 60-foot easement in its title insurance policies. Wilson conveyed to Fellman in 1974, using Western as escrow agent. Fellman's grant deed includes the 60-foot easement. This conveyance in May 1974 was the most recent escrow Western handled involving the 60-foot easement.

---

[1]Statutory references are to the Code of Civil Procedure unless otherwise indicated.

Harris had conveyed another parcel to Hernandez, who conveyed it to Kaufner through an escrow conducted by Western in 1964. Western recorded the grant deed which referred to the 60-foot easement. Also in 1964, Jackson, Crouch, and Fisher acquired title to another of Harris's upstream parcels, and Western conducted that escrow and included the 60-foot easement in the deed. Jackson, Crouch and Fisher conveyed to Weisel, who in 1968 conveyed to Valley Cedar Products through an escrow at Western. Dypvik bought this property from a successor to Valley Cedar Products. Dypvik's deed contained the 60-foot easement language.

Harris conveyed the fourth parcel to Matsumoto in 1965. The deed contained the 60-foot easement language, and was recorded by Transamerica Title. Since Western was an industry leader Transamerica relied on Western's prior recording of the easement, and Transamerica even insured the easement although Western always explicitly declined to do so.

Before Thomson bought his downstream property in 1964, he was aware that upstream landowners used the road for access. His grantor, de Bar, told him that the road was used for access to several properties beyond his. Just to make sure he did not give up any rights he had to his own land, Thomson posted a sign on the road saying that permission to pass was revocable. When Harris saw the sign he tore it down, and informed Thomson he had an easement across the downstream properties. Harris warned Thomson if he did anything like that again, he would sue. Thomson ignored Harris and posted the sign again. Harris and Thomson both consulted attorneys who exchanged letters about the easement.

About this same time Harper informed Thomson that he, too, had a 60-foot easement across the downstream properties. Thomson told Harper that he did not think so, since the easement was not mentioned in his grant deed from de Bar.

In late 1971 Thomson saw a bankruptcy notice posted on an upstream property which described an adjoining upstream property and referred to the 60-foot easement across his and other downstream properties. Thomson asked Stalberg and Wrede if they knew anything about a 60-foot easement, and they too were unaware of it. Thomson visited Western's San Jose office and asked if the upstream owners had a recorded easement across his and the other downstream properties. Western said no such easement appeared in the chains of title.

Thomson went to the county recorder's office, and found the deed of an upstream owner, Matsumoto. Thomson read the deed from Harris to Matsumoto and saw the description of the 60-foot easement. Since he saw the

name of Transamerica Title stamped on the document, he went to Transamerica's office to inquire about the easement. Transamerica told Thomson that the upstream owners had no recorded easement across his property or the properties of Wrede and Stalberg. Thomson did not look for the Harris-Harper deed or any other deeds to upstream properties.

After Thomson had conducted this investigation, Thomson, Wrede, and Stalberg consulted Attorney Austen Warburton in 1972 and retained the firm of Campbell, Warburton, Britton, Fitzsimmons & Smith (Warburton firm). Thomson and the others wanted to find out what the legal rights of the upstream owners were respecting the 60-foot easement over the downstream properties. The Warburton firm searched the title and informed the downstream owners that there was no legal basis for the 60-foot easement, but that they would have to bring a suit to quiet title to delete the easement from the upstream grant deeds.

In 1975 Warburton literally bought into the controversy by purchasing with his sister Rogers a downstream parcel adjacent to those of Thomson, Wrede, and Stalberg. Warburton's parcel was unique because it was L-shaped; part of it was burdened by the easement but another part of it could only be reached by using the road over all the downstream properties.

The Warburton firm did not file the quiet title action (*Thomson v. Dypvik*, *supra*, 174 Cal.App.3d 329, also known as the Dypvik action) until 1977, after some of the upstream owners diverted creek waters away from downstream during a drought year. Plaintiffs (now including Warburton) sought an injunction against the diversion of water, and sought to quiet title to the easement. Warburton, as its insured, notified Western of the controversy in May 1978, requesting Western's assistance in confirming his title. Western considered the letter a claim and began an investigation. Thomson, Wrede, and Stalberg also tendered claims to Western in September 1978. Western replied to these tenders, stating that the Warburton firm was already representing their interests in the quiet title action. Because Warburton thought it was unclear whether all the claims in the complaint were covered by title insurance, he proposed to Western that it pay half the costs and attorney's fees, and Western agreed.

Harris testified at a deposition in November of 1979 in the Dypvik action that he believed his title company, Western, had prepared and recorded his grant deeds to Harper and the others, describing the 60-foot easement. Correspondence from the Warburton firm to Western shows that Warburton knew in February of 1979 that Western had recorded the wild deeds. The Warburton firm also prepared a motion for summary judgment which

showed that Western had requested recordation of the deeds. It is possible that a copy of the motion was sent to Thomson about December 1979.

During the court trial the Dypviks conveyed their property to the Haapojas, who were not parties to the quiet title action. Western rejected plaintiffs' tender of a quiet title action against the Haapojas, mistakenly believing that a lis pendens had been filed on the property and that the Haapojas would be bound by the judgment in the Dypvik action. The Haapoja action settled.

In September 1982 an amended judgment was entered in the Dypvik action, enjoining the upstream owners from interfering with the downstream owners' water rights, and declaring the upstream owners had a 15-foot wide prescriptive easement for ingress and egress across the properties of Thomson, Wrede, Stalberg, and Warburton.

After the trial the Warburton firm sent to Western its bill for half the costs and attorney's fees incurred in the quiet title action. Western paid all the costs and one-half the attorney's fees.

All parties appealed from the amended judgment in the Dypvik action. Plaintiffs lost faith in Warburton and hired another attorney; Western, however, refused to pay plaintiffs' attorney's fees unless they stayed with the Warburton firm. On appeal Thomson, Wrede, and Stalberg contended that the trial court erred by awarding a prescriptive easement to the upstream owners. Warburton contended that the trial court erred in finding the easement to be 15 feet wide, and the upstream owners cross-appealed contending they were entitled to a 60-foot-wide easement by "color of title." This court determined that the upstream owners had a 15-foot-wide prescriptive easement on the road, and that the doctrine of "color of title" could not apply to expand their easement beyond the scope of the actual use. (*Thomson* v. *Dypvik, supra,* 174 Cal.App.3d 329, 338-341.)

In June 1983 plaintiffs Stalberg, Wrede, and Thomson filed their complaint against their title insurer Western. Plaintiffs' cause of action for slander of title was based on Western's knowingly creating the fictitious 60-foot easement and its knowingly recording "wild" deeds with the fictitious 60-foot easement in them. Plaintiffs claimed Western breached its fiduciary duty to them by concealing the existence of the wild deeds. Plaintiffs' causes of action on the policies, breach of contract, breach of the implied covenant and insurance bad faith (Ins. Code, § 790.03, subd. (h)), were based on Western's refusal to pay all the attorney's fees plaintiffs incurred.

At the beginning of the jury trial, the trial court denied Western's motion to bifurcate the trial to try the issue of the statutes of limitations first. Later

the trial court denied Western's motion for nonsuit, brought on the ground that notice to the attorney for plaintiffs (of Western's creation of the fictitious easement) should be imputed to plaintiffs so that plaintiffs' claims for slander of title and breach of fiduciary duty were time-barred. The trial court also declined to instruct the jury that an attorney's knowledge is imputed to his client.

The jury returned a special verdict, finding Western liable to Thomson and Wrede for breach of the insurance contract, and found Western liable to all five plaintiffs for breach of covenant, breach of fiduciary duty, insurance bad faith and slander of title. The jury awarded plaintiffs litigation expenses, and damages for emotional distress and lost time and inconvenience.

*Discussion*

A.  *Slander of Title and Breach of Fiduciary Duty*

The statute of limitations for slander of title is three years. (Former § 338, subd. 7.) The statute of limitations for breach of fiduciary duty is four years. (§ 343.)  ■  A cause of action for slander of title accrues, and the statute begins to run, when plaintiff could reasonably be expected to discover the existence of the claim. (*Arthur* v. *Davis* (1981) 126 Cal.App.3d 684, 690-692 [178 Cal.Rptr. 920].)  ■  A breach of fiduciary duty claim is based on concealment of facts, and the statute begins to run when plaintiffs discovered, or in the exercise of reasonable diligence could have discovered, that facts had been concealed. (*Sanchez* v. *South Hoover Hospital* (1976) 18 Cal.3d 93, 101 [132 Cal.Rptr. 657, 553 P.2d 1129].)

Both of these claims were viable only if plaintiffs discovered their claims less than three years or four years before filing suit in June of 1983. Thomson had found a wild deed in 1971. Western last slandered plaintiffs' titles in 1974. It was incumbent on plaintiffs to prove at trial that their suit brought in 1983 was timely. After seeing the bankruptcy notice on a pear tree in 1971, Thomson had commenced his investigation. Thomson found the Harris-Matsumoto deed, containing the wild easement. Thomson did not look for any other deeds from Harris to other buyers. Once Thomson found a wild deed, the circumstances were such that further inquiry became a duty, and the failure to inquire was negligent. (*Gray* v. *Reeves* (1977) 76 Cal.App.3d 567, 576 [142 Cal.Rptr. 716].) It might be argued that for Thomson the three-year statute ran in 1974, because he was on notice of the slander of title in 1971 yet he failed to investigate further.

While the evidence suggests that Thomson was acting on behalf of Wrede and Stalberg when he conducted the investigation, it is not conclusive.

▉  In any event, the Warburton firm discovered that Western authored the wild deeds in February of 1979, at the latest. This knowledge is imputed to plaintiffs. (*Lazzarevich* v. *Lazzarevich* (1952) 39 Cal.2d 48, 50 [244 P.2d 1].) Since the knowledge is imputed to plaintiffs as of February of 1979, the statute of limitations appears to have run in February of 1983.

The trial court's refusal to instruct the jury that the attorney's knowledge should be imputed to his clients was prejudicial error. Also, although the jury had special verdict forms relating to each plaintiff on each cause of action, there was no place on the form for them to find that the cause of action was time-barred. For the slander and fiduciary duty claims, the only claims Western urged were time-barred below, prejudice is clear.

Plaintiffs assert that because the knowledge acquired by Warburton was outside of the scope of the hire, the knowledge should not be imputed to them. Their argument is that Warburton was only supposed to quiet title to the easement, and he was not required to find out where the wild deeds came from. We reject this contention. In the course of quieting title to the easement, any reasonable attorney would trace the origin of the wild deeds.

Plaintiffs also contend the doctrine of imputed knowledge should not apply because there was a dual agency between Warburton, Western, and plaintiffs. We reject this contention also. First of all, Western did not hire Warburton to represent its insureds. Plaintiffs hired Warburton, and Warburton later asked Western as his own insurer, to share the costs of the quiet title suit. Warburton was a plaintiff, and his interests were allied with plaintiffs. The reason a dual agency involves special rules is that there is a potential for conflict when the insured's interests do not coincide with the insurer's, and the insurer is paying the attorney. When an attorney finds that he cannot give undivided loyalty to both the insurer and the insured, he must disclose the conflict and suggest the insured seek independent legal advice. (*Betts* v. *Allstate Ins. Co.* (1984) 154 Cal.App.3d 688, 716 [201 Cal.Rptr. 528].) Here Warburton was a plaintiff and his interests were allied with plaintiffs. There is not the potential for a disabling conflict of interest here as there is in a case where the insurer hires the attorney, who is unable to serve the interests of both insured and insurer. (Cf. *Betts* v. *Allstate, supra,* 154 Cal.App.3d at pp. 715-717.) The dual agency theory does not operate here to defeat the doctrine of imputed knowledge.

Because the trial court refused Western's instruction on imputed knowledge, the judgment must be reversed as to the slander of title and breach of fiduciary duty causes of action.[2]

## B. Claims on the Policies

Plaintiffs brought three causes of action based on their title insurance policies, breach of contract, breach of the covenant of good faith and fair dealing, and insurance bad faith. (Ins. Code, § 790.03, subd. (h).) Western urges these three causes are time barred for the first time on appeal. ■ Since the statute of limitations defense was not raised below, it is waived. (*Salton Bay Marina, Inc.* v. *Imperial Irrigation Dist.* (1985) 172 Cal.App.3d 914, 940, fn. 4 [218 Cal.Rptr. 839].)

Western argues it offered and the court refused a general jury instruction on statutes of limitations, and that given the refusal, it would have been futile to request specific instructions on the limitations periods for breach of contract, breach of covenant, and insurance bad faith. We reject that argument. The general instruction is too broad to cover the specific limitations periods defendant should have requested. If Western thought the claims on the policies were time barred, it was required to offer the appropriate jury instructions to the trial court in order to preserve the issue for appeal. (*Null* v. *City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1533-1535 [254 Cal.Rptr. 492].) Western waived the statute of limitations defense as to the claims on the policies.

Western next challenges the sufficiency of the evidence supporting the verdicts on the breach of contract, breach of covenant, and insurance bad faith claims. We view the evidence in the light most favorable to the prevailing party below, and resolve conflicts in support of the judgment. (*Chodos* v. *Insurance Co. of North America* (1981) 126 Cal.App.3d 86, 97 [178 Cal.Rptr. 831].)

## 1. Breach of Contract—Sufficiency of the Evidence

■ Western argues that the evidence is insufficient to support the finding that it breached a contractual duty to defend Thomson and Wrede in the Dypvik action. We disagree.

An insurer has a duty to defend its insureds until the final determination of the underlying action. (*CNA Casualty of California* v. *Seaboard Surety Co.*

---

[2]Because the judgment must be reversed on these two causes of action, we need not reach the issue of whether the trial court abused its discretion in denying the motion to bifurcate the issue of the statute of limitations.

(1986) 176 Cal.App.3d 598, 618, fn. 11 [222 Cal.Rptr. 276].) When Western refused plaintiffs' tender of their appeal in the Dypvik action, it breached the contract. Once Western wrongfully denied a defense, it gave up the right to control the litigation and could not insist that plaintiffs use the Warburton firm in order for Western to cover attorney's fees on appeal. (*Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 660 [328 P.2d 198, 68 A.L.R.2d 883].) If Western had proved that the fees were partly allocable to noncovered causes, it would have been entitled to assume less than the whole defense. (*Hogan* v. *Midland National Ins. Co.* (1970) 3 Cal.3d 553, 564 [91 Cal.Rptr. 153, 476 P.2d 825].) Western did not demonstrate that the fees could be logically allocated between covered and noncovered claims.

Before an insurer rejects a tender, it must make an adequate investigation of the facts. Failure to do so bars the insurer from denying the tendered defense, and subjects it to liability for the insureds' full attorney's fees and costs incurred thereafter with other counsel. (*CNA Casualty of California* v. *Seaboard Surety Co.*, *supra*, 176 Cal.App.3d 598, 610.) Western did not demonstrate at trial that it investigated before it decided to pay only half the fees and costs incurred in the Dypvik action. Western did not show it investigated before rejecting plaintiffs' request for attorney's fees for the Dypvik appeal. Western did not show it investigated before refusing plaintiffs' tender of the Haapoja action. Substantial evidence supports the jury's finding that Western breached the contracts of insurance.

### 2. Breach of Covenant—Sufficiency of the Evidence

"There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement. [Citation.]" (*Comunale* v. *Traders & General Ins. Co.*, *supra*, 50 Cal.2d at p. 658.) This principle applies to insurance policies. (*Ibid.*) Stated another way, the insurer must give the interests of the insured at least as much consideration as its own interests. (*Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 818 [169 Cal.Rptr. 691, 620 P.2d 141].)

Here substantial evidence supported the jury's finding that Western breached the covenant of good faith and fair dealing. Western apparently performed no investigation of plaintiffs' claims before it initially denied coverage outright. Western did not show that the causes of action in plaintiffs' complaint could be apportioned half to covered claims and half to excluded claims. Western's refusal to assume full representation in the Dypvik action was especially unreasonable in light of the fact Western created the original wild easement which necessitated the litigation.

Western breached the covenant in other ways. It refused to represent plaintiffs on the Dypvik appeal by refusing to pay attorney's fees unless plaintiffs employed Attorney Warburton, who by then was in a conflict-of-interest position. Western refused plaintiffs' tender of the Haapoja action, again without an investigation. If Western had investigated, it would have found that no lis pendens had been recorded so that the Haapojas would not be bound by the Dypvik judgment. The breach of covenant verdict was supported by substantial evidence.

### 3. *Insurance Bad Faith*

Substantial evidence also supports Western's liability for violating Insurance Code section 790.03, subdivision (h). We think it clear Western violated subdivision (h)(1), misrepresenting to claimants pertinent facts or policy provisions relating to any coverages at issue, among other provisions. Here Western created and recorded the deeds containing the wild easements, and concealed this fact from its insureds. Western misrepresented pertinent facts to its own insureds. Substantial evidence supports the jury's verdict on the insurance bad faith cause of action.

Generally there was substantial evidence supporting all of plaintiffs' claims. The trial court, however, committed prejudicial error in refusing Western's instruction on imputed knowledge, and it essentially removed the issue of the statute of limitations from the jury.

The judgment is reversed as to the slander of title and breach of fiduciary duty causes of action. Western is entitled to a new trial on the issue of the statute of limitations defense to the slander of title and breach of fiduciary duty causes of action. If the factfinder decides the claims are not time-barred, the previous judgment on those two causes of action, including the amounts of damages, shall be reinstated. The judgment is otherwise affirmed. Each party to bear its own costs on appeal.

Agliano, P. J., and Bamattre-Manoukian, J., concurred.

Petitions for a rehearing were denied June 27, 1991.