NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0344n.06

No. 10-5064

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*May 20, 2011*

LEONARD GREEN, Clerk

Rena Purintun Swanson,                              )
                                                    )
        Plaintiff-Appellant,                        )          ON  APPEAL  FROM  THE
                                                    )          UNITED  STATES  DISTRICT
v.                                                  )          COURT  FOR  THE  EASTERN
                                                    )          DISTRICT OF KENTUCKY
Rhonda Renee Purintun Wilson; Kim Lane Wilson;      )
Capitol Indemnity Corporation;                      )          **O P I N I O N**
                                                    )
        Defendants-Appellees.                       )
                                                    )

BEFORE:     GUY, CLAY, and McKEAGUE, Circuit Judges.

**McKeague, Circuit Judge.**  Plaintiff Rena Swanson filed suit against her mother, Rhonda

Wilson; her step-father, Kim Wilson; and several corporate entities to recover her share of a lawsuit

settlement related to her father's accidental death when she was young.  Swanson alleges that her

mother was a fiduciary in several respects, and breached the duties she owed her daughter by

concealing the existence of settlement proceeds belonging to Swanson, and by using fraudulent

means to gain access to Swanson's settlement funds for her own use and benefit.

The district court concluded that this action was barred by the applicable statute of

limitations.  Though we disagree with particular determinations made by the district court, we agree

with its ultimate conclusion and therefore **AFFIRM** the grant of summary judgment.

**I.  BACKGROUND**

Plaintiff Rena Swanson ("Rena" or "Plaintiff") was three years old when her father, Leroy Purintun ("Leroy"), was killed in an oil tank explosion in Illinois. Following the accident, his wife, Defendant Rhonda Renee Purintun Wilson ("Rhonda") brought a wrongful death action in Illinois state court as administratrix of Leroy's estate, and as guardian of her two minor children, Rena and her sister, Melissa. The case was settled in 1990—at that time, Rena was nine years old.

Rena's claims were settled for $234,375. The defendants in that settlement agreed to pay $109,375 immediately, with approximately $95,000 going to litigation costs and attorney's fees, $1,193 to pay estate costs and fees, and the remaining $12,388.71 to be used to open a restricted bank account in Rena's name. The court and parties intended that this account is where Rena's portion of the immediate settlement proceeds, as well as future payments, would be deposited and held until she attained majority (or the Circuit Court of Cook County ordered the funds released).

The settlement also provided that Safeco Insurance Company of America ("Safeco"), the liability insurer of the defendants in the wrongful death suit, would make periodic payments to Rena. This payment schedule included $300 monthly payments until Rena reached the aged of 18, with an interest rate of six percent compounded annually—these payments would be made to the secure bank account. The settlement also included nine large lump-sum payments to be paid periodically to Rena between the ages of 18 and 22—these payments would total $248,000.[1]

---

[1]Safeco made a qualified assignment of its payment obligation to Symetra Assigned Benefits Service Company. To fund the payments, Symetra entered into an annuity contract with Symetra Life Insurance Company ("Symetra Life"). Safeco also issued a surety bond under which it promised to make the settlement payments to Rena if Symetra failed to perform. Claims against the corporate successors to these parties were settled and are not involved in this appeal. The only remaining parties are Rena Swanson; her mother, Rhonda Wilson; her stepfather, Kim Wilson; and Capitol

In order to facilitate the creation of the restricted account and the deposit of the first settlement payment, the Probate Court appointed Rhonda as the guardian of Rena's court estate. Defendant Capitol Indemnity Corporation obligated itself as surety on Rhonda's fiduciary bond. Rhonda opened an account in Rena's name at American National Bank and Trust Company of Chicago ("American National Bank") and deposited the original $ 12, 388.71 payment into that account. That same day, following production of the necessary documents to the Probate Court, the Court closed Rena's estate, discharged Rhonda from further duty as guardian of that estate, and released Capitol from further surety obligations. Rhonda, however, remained Rena's sole legal guardian.

For the next nine years, Symetra Life deposited all of the scheduled monthly payments and the first lump-sum payment directly into Rena's restricted bank account at American National Bank. Though Rhonda was the signatory on this account, the Probate Court had indicated that no withdrawals could be made without court approval, and there is no indication that any funds were removed from the account during that time.

In early 1995, Rhonda and Rena moved to California. Later that year, Rhonda married Defendant Kim Wilson ("Kim"), and the family moved to 8500 Todd Court, Riverside, California. Three years later, Rena turned eighteen on September 28, 1998, at which time, she still resided with Rhonda and Kim. Rena alleges that in the nine years between the settlement and her reaching the age of majority, she was never informed of the existence of the settlement benefitting her. Rena's

---

Indemnity Corporation, the surety on Rhonda's fiduciary bond.

grandmother stated in her deposition that Rhonda told her not to mention the money to Rena, because Rena was too immature to handle it. Rena alleges that her mother intentionally withheld the existence of the settlement and money from her.

Shortly after her eighteenth birthday, Rena had an argument with her mother and moved out of the house. She flew to Guam to be with her boyfriend, Robert, who was in the U.S. Navy. Rena and Robert were married in December 1998, and they remained in Guam until August 1999. At that time, Robert was discharged from the U.S. Navy, and the family moved back in with Rhonda and Kim. When Robert found another job, he and Rena made plans to move into their own apartment.

However, before they moved, Rhonda induced Rena to sign a Durable Power of Attorney, which empowered Rhonda to act on Rena's behalf with respect to various matters, including banking transactions. She told Rena this would allow her to "help" with various matters. The document stated that Rhonda was granted a general power of attorney, appointed as Rena's "attorney-in-fact," and authorized Rhonda to "act in my name, place, and stead in any way which I myself could do" with respect to certain matters. Specifically, Rena initialed spaces on the document authorizing her mother to act for her in "tangible personal property transactions," "bond, share and commodity transactions," and importantly, "banking transactions" and "records, reports and statements." Rhonda then signed the form, stating that she "accepts this appointment" and "agrees to act and perform in said fiduciary capacity consistent with [Rena's] best interests." This Power of Attorney was executed on October 25, 1999.

In November 1999, Rena and Robert moved into their own apartment in California. Also during that month, American National Bank in Illinois received a letter, purportedly signed by Rena,

which stated: "I, Rena S. Purintun, have reached the age of majority and would like all of my funds released, including the CD deposit. I have enclosed all of the documents you require. Please send the check promptly." The letter included copies of Rena's birth certificate, California identification card, and Social Security card. The return address on the letter was "8500 Todd Court, Riverside, California," her mother's address where Rena no longer resided. Although denied by Rhonda, Rena alleges that she did not send or authorize this letter, and that her mother signed her name and requested the money.

On November 9, 1999, pursuant to the letter, American National Bank closed the restricted account and issued two cashier's checks, made payable to Rena, for a total of $67,957.05. Both checks were sent to California and were apparently cashed on November 17, 1999. The defendants contend that Rena cashed these checks, but Rena asserts that she did not; records do not exist to demonstrate where or by whom the checks were cashed.

On December 19, 2000, Symetra Life also received a notarized letter, purportedly signed by Rena, requesting that Symetra Life "[p]lease forward all of the payments you are holding on my Annuity Contract . . . to my above address." The return address was again "8500 Todd Court," Rhonda and Kim's home, where Rena had not lived for over a year. Symetra Life honored the request and sent the remaining checks to Rena at Rhonda's address. The first check was cashed at a Bank of America branch. Rena denies that she was the one who requested this change, but states that her mother had her sign several documents she did not understand, and had her sign a blank sheet of paper, in order to help her with her finances.

In early 2001, Robert lost his job and he and Rena planned to move with their two daughters to Georgia, to be near Robert's mother. Before this move, Rhonda and Rena opened a joint bank account with Bank of America. Rhonda told Rena that having such an account would help her, because she would put her own (Rhonda's) money in it occasionally to help Rena pay living expenses. Rhonda also promised that when Rena bought a house, she would help with the down payment. Besides the first check, all remaining checks from Symetra Life were deposited into this joint account. Each was purportedly endorsed by "Rena S. Purintun," with a few additionally bearing the endorsement of "Rhonda Renee Wilson." Rhonda admits signing Rena's name to checks, but denies that these were unauthorized forgeries.

After living in Georgia for about six months, Rena and Robert again moved in September 2001, to live with Robert's father in Minnesota. In November of that year, Rhonda apparently asked her mother for financial help. Her mother sent Rena an email, saying she would send a couple hundred dollars that Rena requested, but that "we won't be able to send you anymore for a long time." Rhonda continued that "I can't continue to help you and Melissa with money because I will end up with no home and no money. . . . After all I have given a lot already." At this time, however, the joint account contained at least $62,000 of Rena's money; Rena claims she was unaware of these funds.

In April 2002, Rena visited her (estranged) sister, Melissa, in Wisconsin. Rena learned from Melissa that she might be entitled to receive some money in connection with their father's death. Melissa told her that she had received a large amount of money, and that Rena had a right to receive a similarly large sum from their mother, Rhonda. Following this discussion, Rena asked Rhonda

about the money, but Rhonda told Rena that Melissa had lied about the money.  As the district court in this case stated, "Rena apparently believed Rhonda's explanation, for she did not contact Melissa again, nor did she speak to anyone else about the settlement money."  Rena claims that even at this time, she "had no idea about the settlement and the significant funds that had been funneled" from her Illinois account to Rhonda and Kim.

In October 2002, Robert and Rena wanted to buy a house, but when Rena asked Rhonda to assist them, she refused.  Worried that her family might soon have nowhere to live, Rena remembered the joint bank account opened in 2001.  She called Bank of America to inquire about the account's balance, and was surprised to learn that the account contained $62,520.71.  According to Rena, she learned on November 29, 2002 that the source of the funds had been checks that bore her name, coming from an annuity company in Washington.

On December 3, 2002, Safeco Life received a notarized letter from Rena ,which read: "I have not received, deposited, or cashed any checks from Safeco Insurance.  I first became aware that checks issued to my name from Safeco Insurance were being signed, deposited, and withdrawn on 11/29/2002."  In response, Safeco Life faxed two letters to Rena.  The first, on December 3, 2002, explained that its annuity contract was purchased "to fund payment obligations under a settlement agreement for a personal injury or wrongful death claim." It further detailed all of its payments made to Rena's restricted minor's account at American National Bank (totaling approximately $29,000), and check payments made out to Rena—beginning in 1998—totaling approximately $248,000.  The second fax, sent on December 6, 2002, included copies of the settlement agreement and the last three settlement checks, all of which were deposited into the joint account (these totaled $173,000).

When she received the first letter from Safeco, Rena promptly opened an individual bank account at Bank of America and transferred the entire balance of the joint account into her personal account. However, Rena testified that at this time, she did not understand what all of this meant, and was trying to figure out what was going on. She states that transferring the funds "would protect this part of the money while Rena continued her investigation."

In February 2003, Rena and Robert purchased a house in Minnesota. In June 2003, Rhonda and Kim moved to Kentucky. Shortly after the move, Rena called Rhonda and Kim, confronting them about the money and demanding an explanation regarding the existence and location of her settlement money. Rhonda and Kim denied the existence of any settlement money belonging to Rena or any wrongdoing. Instead, Rhonda told Rena that she (Rhonda) had committed tax fraud: she insinuated that the money was really hers (Rhonda's), the tax fraud scheme was why the money was in Rena's name, and that she had done nothing wrong to Rena.

In July 2003, Rena sent affidavits to Safeco which stated that the signatures on the lump-sum checks issued in her name were "forgeries." She also sent a letter dated July 21, 2003, requesting that Safeco send her all information regarding her annuity account, including the account number for the American National Bank account. She stated, "I need these numbers to inquire about this account as it may have been taken by my mother in the same fashion as the checks made payable to me from Safeco." Rena contacted American National Bank on July 22, 2003, and was informed that her restricted account had been emptied in 1999. Rena denied sending the notarized letter authorizing the closing of the account, and requested that the bank send her all bank statements for

the account. Rena received those records—showing all deposits and the withdrawal—on August 25, 2003.

On October 29, 2003, Rena filed a Motion for Accounting before the Circuit Court of Cook County Probate Division, in Illinois. Rena alleged in that motion that Rhonda had not only concealed the existence of the settlement funds, but had forged her signature on various letters and checks in order to gain control and use of the money intended for Rena. The record does not reflect whether or how the Probate Court ruled on this motion. Then on January 26, 2004, Rena formally filed a Complaint against Rhonda in the Chancery Division of Cook County. She alleged that her mother was in a fiduciary relationship with her, and that she had hidden the existence of the funds, used her Power of Attorney to withdraw the American National Bank funds, and directed the annuity payments to her own California address. The complaint demanded a complete accounting of all funds received; but also asked that (1) Rhonda pay the costs of the accounting, (2) Rhonda pay Rena's attorney's fees, (3) Rhonda be "ordered to cease and desist dissipating funds intended for the Plaintiff, and (4) "any further relief the court deems just and proper." The record does not indicate how the Probate Court ruled on this motion.

Rena filed the instant action on March 9, 2007. In the Complaint, Rena repeated these allegations against Rhonda, and added claims against Kim and the various corporate entities. Shortly, the claims against JPMorgan Chase, Safeco, Symetra, and Symetra Life were all settled. The only remaining claims were against Rhonda for (1) an accounting, (2) breach of fiduciary duty and/or constructive fraud, (3) conversion, and (4) fraud; against Kim Wilson for (1) conversion, and

(2) aiding and abetting fraud; and against Capital Indemnity Corporation for indemnification of Rhonda.

Defendants filed a Motion for Summary Judgment, and Rena filed a Motion for Partial Summary Judgment. On December 22, 2009, the district court concluded that all of Rena's claims were time-barred by the applicable statute of limitations, and thus granted Defendants' motion for summary judgment. Rena timely appealed.

## II. Standard of Review

This Court reviews a district court's grant of summary judgment *de novo*. *Parsons v. City of Pontiac*, 533 F.3d 492, 499 (6th Cir. 2008). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Where, as here, the defendant moves for summary judgment based on statute-of-limitation grounds, summary judgment is appropriate if the statute of limitations has run and there is no genuine issue of material fact as to when the plaintiff's cause of action accrued. *Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001). The burden is on a defendant to show that the statute of limitations has run. *Id.* However, once the defendant carries that burden, the plaintiff has the burden to establish an exception to the statute, such as tolling or late discovery of the injury. *Id.* Here, the injury clearly began in 1999, which is beyond the applicable statute of limitations in any relevant jurisdiction. Therefore, the burden falls on the Plaintiff to demonstrate that an exception to the statute makes her suit timely.

## III. The Applicable State Law

A district court, sitting in diversity, must apply the law of the forum state in determining statute of limitations questions. *See, e.g., Atl. Richfield Co. v. Monarch Leasing Co.*, 84 F.3d 204, 205 (6th Cir. 1996). Here, that is Kentucky. *See Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004). The district court correctly determined that the statute of limitations is governed by Kentucky's borrowing statute, Kentucky Revised Statutes § 413.320, which states:

> When a cause of action has arisen in another state or country, and by the laws of this state or country where the cause of action accrued the time for the commencement of an action thereon is limited to a shorter period of time than the period of limitation prescribed by the laws of this state for a like cause of action, then said action shall be barred in this state at the expiration of said shorter period.

KY. REV. STAT. ANN. § 413.320. A three-step analysis is therefore necessary to determine the applicability of this statute: (1) did the cause of action accrue in another state? (2) If so, is that state's statute of limitations for the particular cause of action shorter than the corresponding Kentucky statute of limitations? (3) If so, application of the accrual state is applied; if not, Kentucky's statute of limitations is applied. *See Willits v. Peabody Coal Co.*, Nos. 98-5458, 98-5527, 1999 WL 701916, at *12 (6th Cir. Sept. 1, 1999).

Here, the relevant Kentucky statute of limitations is five years. *See* KY. REV. STAT. ANN. § 413.120. The Illinois provision applicable to these causes of action is also five years. *See* 735 ILL. COMP. STAT. 5/13-205. California, however, provides for either a three- or four- year limitation period. *See* CAL. CIV. PROC. CODE §§ 338(d), 343. Therefore, if the cause of action accrued in California, that state's statute of limitation would apply in place of Kentucky's.

The district court determined that the place of accrual was California. First, it stated that looking to "where the injury is sustained" is not helpful in a case—like this one—that involves

purely economic injury. It then rejected Plaintiff's argument that Illinois is the "logical choice" for where the action accrued, construing her argument as a contention that Illinois had the "most significant relationship" to the case, which is a standard that has been rejected by this Court under Kentucky's borrowing statute. *See Combs*, 354 F.3d at 592. Lastly, the district court stated that instead, this Court has looked to *when* a cause of action accrued to determine the *place* of accrual. It then determined that the "when" in this case was when the defendant committed the first allegedly wrongful conduct of requesting the funds—before any money was actually removed from the Plaintiff's accounts—and that therefore, the "where" was where the defendant acted—in California.

A. The Place of Accrual

"Where" a cause of action accrues, for purposes of Kentucky's borrowing statute, is unclear. In cases, like this one, where the location of accrual is not readily apparent, this Court has looked to *when* a cause of action accrued to determine the *place* of accrual. "[T]he elements of time and place of accrual are inextricably intertwined: 'The time when a cause of action arises and the place where it arises are necessarily connected, since the same act is the critical event in each instance. The final act which transforms the liability into a cause of action necessarily has both aspects of time and place.'" *CMACO Auto. Sys., Inc. v. Wanxiang Am. Corp.*, 589 F.3d 235 (6th Cir. 2009) (quoting *Willits,* 188 F.3d 510, at *12. Therefore, we must determine both when and where Rena's cause of action accrued.

This Court has previously predicted how Kentucky would determine where an action accrues for purposes of its borrowing statute. However, in *Willits v. Peabody Coal Co.*, 188 F.3d 510, 1999

WL 701916 (6th Cir. 1999), we addressed a breach of contract claim, not a tort claim,[2] but agreed with the parties that "a cause of action accrues when and where the breach occurs and the injured party holds the right to sue." *Id.* at *12 (citation omitted). *Willits* went on to determine that the contract action accrued in Missouri, where the defendant breached the contract, not where the plaintiffs each received their royalty checks by mail. *Id*. at *13.

However, we do not find *Willits'* result to be controlling in this case. First, it relied upon Kentucky's Uniform Commercial Code statute of limitations, regarding contracts of sale, not on any Kentucky law of torts. Furthermore, the reasoning that "a cause of action accrues where the breach occurs and the injured party holds the right to sue" is not helpful here, for unlike in a contract-breach action, the time of the defendant's fraudulent conduct in this tort case is *not* also the time the plaintiff held the right to sue—because it was not the time when injury actually occurred. To the extent that *Willits* is instructive, it must be interpreted correctly in the tort context: "a cause of action accrues when and where the breach occurs and the injured party holds the right to sue," *id*. at 12, and therefore, a cause of action does not accrue until both the wrong (breach) occurs *and* the injured party holds the right to sue: in other words, injury must occur before the action accrues.

Later, in a published case, *Combs v. International Insurance Co.*, 354 F.3d 568 (6th Cir. 2004), this Court again dealt with Kentucky's borrowing statute, although this time it was primarily grappling with the plaintiff's contention that the statute should incorporate a "most significant

---

[2]There are indications that Kentucky treats such issues differently for torts and for contracts. *See, e.g., Combs,* 354 F.3d at 592-93 (detailing different treatment of contract and tort cases, and concluding "Kentucky began to depart from the lex loci approach to torts . . . . The Kentucky Supreme Court, however, did not make the same change with respect to contract cases").

relationship test," which *Combs* declined to do. *Combs* acknowledged that "[t]his is a highly uncertain area of state law, forcing us to make an educated '*Erie* Guess.'" *Id.* at 577.

The Court noted problems in the application of borrowing statutes, and stated that the "most significant relationship" test "has at least arguable policy advantages over lex fori because the state with the most significant relationship with the parties and the dispute is probably the state with the greatest interest in the action's outcome." *Id.* at 580. However, the Court also noted that the "accrual approach" found in the text of Kentucky's statute "produce[s] several meaningful policy advantages" as well. *Id.* at 589. "If Kentucky fails to respect that a cause of action accrues in a foreign jurisdiction, like New York, although the final event necessary for the cause of action occurred in New York, Kentucky shows disrespect for New York's territoriality in derogation of comity principles that the Kentucky Supreme Court may value." *Id.* at 591. Ultimately, the Court determined that "Kentucky would not apply a 'most significant relationship' analysis when applying Kentucky's borrowing statute."[3] *Id.* at 592.

---

[3]There is at least some indication that this prediction, too, was incorrect. *Combs* relied in large part on its conclusion that while "Kentucky began to depart from the lex loci approach to torts," it "did not make the same change with respect to contract cases." *Combs*, 354 F.3d at 592. But in *Schnuerle v. Insight Comm. Co., L.P.*, —S.W.3d—, 2010 WL 5129850 (Ky. 2010), the Kentucky Supreme Court cited the Restatement for the rationale of discarding "lex loci contractus": "[t]he modern test is which state has the most significant relationship to the transaction and the parties." *Id.* at *4. In *Saleba v. Schrand*, 300 S.W.3d 177 (Ky. 2009), the Kentucky Supreme Court noted that—at least in a choice of law dispute—"Kentucky has consistently applied § 188 of the Restatement (Second) of Conflict of Laws to resolve choice of law issues that arise in *contract* disputes. [That section] states in its entirety: '[t]he rights and duties of the parties with respect to an issue *in contract* are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties. . . .'" *Id.* at 181.

Therefore, this Court predicted that in Kentucky, when the "final event necessary for the cause of action occurred" elsewhere, that state's law should govern. In struggling with what test to apply, however, the Court then stated:

> [T]he notion that the cause of action accrues where the injury is sustained is not particularly helpful in this case because it begs the question of where the plaintiff sustained the injury. Plaintiff's action involves an abstract injury—by allegedly breaching its promise to pay in a letter Defendant mailed from New York to three jurisdictions, Decedent was not reimbursed for litigation expenses accumulated primarily in California but related to a Kentucky enterprise. Asking where Decedent "got hurt" does not help us.

*Id.* at 582. *Combs* ultimately predicted that under Kentucky law, the cause of action "accrued" in the place of breach for a contract suit. It did not, however, reach the issue here—whether, in a *torts* case, the place of breach or place of injury is "where" the claim accrued.

Here, the unpublished *Willits* and, arguably, *Combs* would suggest that "where" a claim accrues for purposes of Kentucky's statute must be determined by where the defendant's wrongful conduct occurred. This is what the district court concluded. A panel cannot reconsider a prior published case that interpreted state law, "absent an indication by the [state] courts that they would have decided [the prior case] differently." *Blaine Constr. Corp. v. Ins. Co. of N. Am.,* 171 F.3d 343, 350 (6th Cir. 1999). However, it seems just such a decision has come down in Kentucky.

In *Queensway Financial Holdings Ltd. v. Cotton & Allen, P.S.C.*, 237 S.W.3d 141 (Ky. 2007), the Kentucky Supreme Court, considering a claim of professional negligence, dealt with its own statute of limitations, and directly answered the question of when a cause of action accrues.

> The accrual rule is relatively simple: "'[A] cause of action is deemed to accrue in Kentucky where negligence and damages have both occurred." [*Michels v. Sklavos,* 869 S.W.2d 728 (Ky. 1994)] at 730 [internal citations omitted] . . . . Basically, "a

'wrong' requires both a negligent act and resulting injury. Damnum absque injuria, harm without injury, does not give rise to an action for damages against the person causing it." *Id.* at 731. The difficult question when applying the rule is usually not whether negligence has occurred but whether an "'irrevocable non-speculative injury'" has arisen. *Id.* at 730 (quoting *Northwestern Nat. Ins. Co. v. Osborne*, 610 F. Supp. 126, 128 (E.D. Ky. 1985)).

*Queensway*, 237 S.W.3d at 147. The Court further stated that "mere knowledge of some elements of a tort claim, such as negligence without harm, is insufficient to begin running the limitations period where the cause of action does not yet exist." *Queensway,* 237 S.W.3d at 148 (citing *Michels*, 869 S.W.2d at 721-32). This is because wrongful conduct, without injury, "does not give rise to an action," and therefore the action *accrues* once all of the elements supporting liability have actually occurred. *See id.*

Here, an action for fraud requires not only the allegedly wrongful conduct by the defendant, but also a loss to the plaintiff. Thus, the "when" for accrual purposes in Kentucky—and in this case—is not judged by when the defendant breached, as the district court found. Instead, it is determined by when the injury occurred. Here, that is the time that the fraudulent communications from the defendant actually resulted in the funds being wrongly taken from the Plaintiff.

The When in this Case

The time at which Plaintiff actually suffered injury is also not clear in this case. On one hand, during the relevant time period, Rhonda held a Power of Attorney over Rena's banking transactions. Arguably, then, Rhonda's removal of the funds from the Illinois bank account was not itself a loss to Plaintiff. For example, if Rhonda—as a fiduciary—had removed the funds from the Illinois account, but handled them faithfully on Rena's behalf, no injury would actually have resulted to

Rena. Instead, it was when the fiduciary acquired the funds and *misappropriated them* for herself that injury actually resulted. Since Rena focuses on her mother's position as a fiduciary, this is a logical approach to determining the injury.

On the other hand, it is unclear whether Rhonda's alleged acts to remove the funds constituted fiduciary acts, because she did not sign the forms under her Power of Attorney status, clearly acting on Rena's behalf. Instead, the documentation sent to the bank could be viewed as strictly fraudulent, because Rhonda pretended to be Rena herself. If the act is viewed as one of mere fraud, not an act within Rhonda's fiduciary power, then the injury occurred when the funds were wrongly removed from Plaintiff's Illinois annuity account. In that scenario, the funds were removed under false pretenses, and as soon as the funds were emptied, the Plaintiff suffered the loss. If that is true, then the claim accrued when the bank emptied the account.

However, we need not decide which approach to take, for both ultimately lead to the same conclusion as to *where* the claim accrued.

The Where in this Case

Under this Court's precedent, the "when" also tells us the "where." If Rhonda was a fiduciary and thus no loss occurred until the funds were actually misappropriated, then the loss occurred *when* Rhonda actually took the funds, and *where* the loss occurred—California. The monies from the Illinois account were sent to California, and it was there that Rhonda received them, signed Rena's name to them, and took the funds for herself. Therefore, California is both the place where the loss actually occurred, and where Rena "felt" it—because she was living in California at that time.

- 17 -

If, in the alternative, Rhonda simply committed fraud, then the injury occurred *when* the funds were removed from the Illinois account. However, this does not mean that the injury occurred in Illinois. While Kentucky has not spoken on this issue, several jurisdictions have recognized that economic loss cases present a special situation. In these cases, the injury is said to happen where the plaintiff resides and thus "feels" the loss, not where the account happens to be. In *Caproni v. Prudential Sec., Inc.*, 15 F.3d 614 (6th Cir. 1994), this Court interpreted Michigan's similar borrowing statute in a securities fraud action. *Caproni* "adopted the Second Circuit's 'sensible rule' that the place where the economic impact is felt, normally the plaintiff's residence, is the place of accrual." *Freeman v. Laventhol & Horwath*, 34 F.3d 333, 340 (6th Cir. 1994) (quoting *Caproni*, 15 F.3d at 618). The Court held that "to the extent these four plaintiffs resided in states other than Kentucky and felt the economic impact of the bond default in their respective states of residence, those states represent the place where the economic injury was suffered." *Id.* at 341. In doing so, the Court cited to *Arneil v. Ramsey*, 550 F.2d 774 (2d Cir. 1977), which reasoned that, "to the extent [the plaintiffs] suffered a financial loss from their transaction with [the defendant], they suffered it in Washington [where they resided], [t]o the extent they became poorer men, they became poorer Washingtonians." *Caproni*, 15 F.3d at 619 (quoting *Arneil*, 550 F.3d at 780).

Furthermore, this Court later assessed a similar action in Kentucky. In *Freeman*, this Court held that for the purpose of determining the applicability of Kentucky's borrowing statute, the residence of the plaintiffs controlled. *Freeman*, 34 F.3d at 341 ("We find that to the extent these four plaintiffs resided in states other than Kentucky and felt the economic impact of the bond default in their respective states of residence, those states represent the place where the economic injury was

suffered."). The rationale in these cases is not limited to securities cases; instead, it is that "economic" harm is felt where a plaintiff resides. Therefore, this Court has already predicted how Kentucky would apply its borrowing statute in this case: it would find that Rena's harm was felt where she was living when first injured—California.

Lastly, at least one Kentucky case suggests that Kentucky would elect to apply the California statute of limitations in this case *even if* Rena was injured in Illinois. In *Abel v. Austin*, –S.W.3d –, 2010 WL 2132745 (Ky. App. 2010), the Kentucky Court of Appeals addressed a choice of law question, and began with examination of the borrowing statute. The case involved claims of breach of fiduciary duty, misrepresentation, and fraudulent conveyance, where the plaintiffs alleged that their lawyers had mishandled or misappropriated class action settlement funds. *Id.* at *1. The appellants relied on *Queensway* to argue that both negligence and damages must occur in order for a cause of action to arise, and therefore that the causes of action accrued in Kentucky because deprivation of funds occurred there, rather than in Alabama, where the breach occurred. *Id.* at *8. The court rejected the appellants' argument: "[E]ven though the action may have accrued in Kentucky [because the injury occurred there], nothing mitigates against a determination that the action *also* accrued in Alabama." *Id.* at *8 (emphasis added). The court noted that the defendants' actions occurred only in Alabama, that the defendants never met with any of the appellants because they simply sent the funds from Alabama to Kentucky, and that the events were "processed, settled, reviewed, and confirmed by an Alabama court." *Id.* Because the applicable Alabama statute of limitations was shorter, the court applied the Alabama statute and dismissed the claims.

*Abel*, then, indicates that a cause of action in this context can "accrue" in more than one state, and that when that occurs, the shorter statute of limitations should govern. Under *Abel*, both parties may be correct: the action accrued in California because the parties both resided there and the defendant's alleged misconduct occurred there, and it accrued in Illinois because that is where the money was fraudulently taken. But in such a conflict, if a state's statute of limitations is shorter than Kentucky's, it controls. Because California's statute is shorter here, that law would still apply.

Simply put, all roads lead to California. This Court need not decide whether Rena was injured when Rhonda misappropriated the funds, Rena was injured by the Illinois loss but felt it where she resided, or the action accrued in more than one place, for the California statute of limitations inevitably applies.

## IV. The Length of the Statute of Limitations

In California, the limitations period for an action based on fraud or mistake is three years, CAL. CIV. PROC. CODE § 338(d), but the limitations period for breach of fiduciary duty is usually four years, *id.* § 343.[4] Plaintiff argues that if California law applies, the four-year provision governs; Defendants argue that the three-year provision controls. However, in California, "[t]he statute of limitations to be applied is determined by the nature of the right sued upon, not by the form of the action or the relief demanded." *Day v. Greene*, 59 Cal. 2d 404, 411 (1963). Therefore, in deciding what statute of limitations to apply to Rena's claims, we must look to the gravamen of her complaint

---

[4]No statute of limitations expressly applies to a cause of action for breach of fiduciary duty, but a cause of action not specifically subject to another statute of limitations is governed by § 343, including breach of fiduciary duty. *Stalberg v. W. Title Ins. Co.*, 230 Cal. App.3d 1223, 1230 (Cal. App. 6 Dist. 1991).

rather than the cause of action pled. *City of Vista v. Robert Thomas Sec., Inc.*, 84 Cal. App. 4th 882, 889, 101 Cal. Rptr. 2d 237 (2000). Where the gravamen of the breach of fiduciary cause of action is fraud, the applicable limitation period is the three year period found in § 338. *Mullin v. Valley of Cal., Inc.*, No. A124641, 2010 WL 3158617, at *4 n.2 (Cal. App. 1 Dist. Aug. 11, 2010).

California courts have consistently applied the three-year period to cases like this one that involve both fraud and fiduciary issues. For instance, in *City of Vista,* Vista brought a claim for "breach of fiduciary duty" against its former securities dealers based on the dealers' alleged conduct in misrepresenting the nature of securities sold to the city and charging a markup rate for those securities. *See* 84 Cal. App. 4th at 885. On appeal, the city contended that a four-year limitations period applied to its claim. The Court of Appeals disagreed, holding that because "[t]he gravamen of Vista's complaint is that [defendants'] acts constituted actual or constructive fraud," the three-year statute of limitations applicable to fraud claims governed the breach of fiduciary duty action. *Id.* The state's courts have reached the same result in a variety of cases. *See, e.g., Wyatt v. Union Mortg. Co.*, 24 Cal. 3d 773, 786 n.2 (1979) (holding that where the "gravamen of respondents' cause of action is that the appellants committed actual and constructive fraud by conspiring to breach their fiduciary duties[,] . . . Code of Civil Procedure section 338, subdivision 4 states the applicable statute of limitations"); *Hatch v. Collins*, 225 Cal. App. 3d 1104, 1110 (Cal. App. 1990) (applying the three-year statute of limitations to a claim for breach of fiduciary duty where the action was "founded upon a fraudulent conspiracy" by defendants to defraud plaintiff in a real estate transaction); *Greene Trio Music, LLC v. Jackson*, No. B200087, 2008 WL 2719582 (Cal. App. 2 Dist. July 14, 2008)

(holding that the three-year provision, not the four-year "catch-all," was applicable when the breach

of fiduciary duty claim essentially alleged constructive fraud on the part of the defendant fiduciary).

Therefore, under California law, the three-year statute of limitations applies.

## V. The Date of Discovery

The district court found that the "discovery rule" was applicable to toll the statute of

limitations in this case. Therefore, the true date of injury—when the plaintiff was first allegedly

deprived of her funds—was not used as the start date for the limitations period. In applying the

discovery rule, the district court stated that the statute of limitations begins to run "when [the

plaintiff] has been put on notice that she may have been injured," and that this is a "reasonable

person" standard, not a subjective one. Ultimately, the court relied on Rena's letter to Symetra,

which explicitly stated, "I first became aware that checks issued to my name from Safeco Insurance

were being signed, deposited, and withdrawn on 11/29/2002." The court concluded that this letter

established that "no later than November 29, 2002, Plaintiff had knowledge of sufficient facts to put

her on notice that funds had been stolen from her, thereby triggering her obligation to investigate

further in order to determine the extent and cause of her injury."

First, the court correctly concluded that the "discovery rule" tolls the statute of limitation in

a case such as this, where the plaintiff is unaware of the existence of his or her cause of action due

to concealment by another. *See Jolly v. Eli Lilly & Co.*, 751 P.2d 923, 928 (Cal. 1988). "'[U]nder

the delayed discovery rule, a cause of action accrues and the statute of limitations begins to run when

the plaintiff *has reason to suspect* an injury and some wrongful cause . . . .'" *E-Fab, Inc. v.

Accountants, Inc. Serv's,* 153 Cal. App. 4th 1308, 1319 (emphasis added) (quoting *Fox v. Ethicon*

- 22 -

*Endo-Surgery, Inc.,* 35 Cal. 4th 797, 803 (2005)).  Notice sufficient to trigger accrual of a cause of action under the delayed discovery rule may be actual or constructive.  *E-Fab,* 153 Cal. App. 4th at 1318.

However, Rena argues that the district court erred in applying the ordinary discovery rule, because her mother was her fiduciary and therefore "inquiry" or "constructive" notice does not apply. Instead, she argues, the accrual is postponed "until the beneficiary has knowledge or notice of the act constituting a breach of fidelity." *United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.*, 1 Cal. 3d 586, 596 (Ca. 1970).  Her argument is essentially that the plaintiff has placed trust in the defendant fiduciary and thus, there is no duty to exercise due diligence in discovering the fraud. Instead, she argues, the clock does not begin to run until the plaintiff has *actual notice* of the fraud.[5]

---

[5]Defendants argue strenuously that Rhonda was no longer in a fiduciary capacity to her daughter at all.  This argument is unpersuasive, as Rhonda served in a fiduciary capacity both as the administratrix of Rena's father's estate, and as Rena's guardian when Rena was a minor.  These roles included the duty to protect the interest of beneficiaries, and the duty to manage property in the minor's name. *See Morgan v. Asher*, 49 Cal. App. 172 (Cal. App. 1920) (finding that where a mother was both the trustee of her husband's estate and the guardian of her daughter, "[i]t was her duty . . . independent of and apart from such probate proceedings . . . to see to it that those several persons entitled to their distribute share in said estate were fully informed as to their rights in the premises, to the end that said rights might be fully protected in the distribution of said estate"); *see also Sohler v. Sohler*, 135 Cal. 323 (1902) (holding that as a child's mother and legal guardian, the defendant "was under most solemn obligation to protect the legal rights of her infant and dependent offspring").  "The duty of a fiduciary embraces the obligation to render a full and fair disclosure to the beneficiary of all facts which materially affect his rights and interests.  'Where there is a duty to disclose, the disclosure must be full and complete, and any material concealment or misrepresentation will amount to fraud. . . .'" *Neel v. Magana, Olney, Levy, Cathcart & Gelfand*, 6 Cal.3d 176, 188-89 (1971) (quoting *Pashley v. Pac. Elec. Ry. Co.*, 25 Cal. 2d 226, 235 (1944)). Therefore, at the very least, Rhonda's wilful concealment of the settlement's existence and location was a breach of her fiduciary duty as Rena's guardian, and such breach did not disappear simply because Rena reached the age of majority.

However, the very case relied upon by Plaintiff goes on to say that "[u]nder the fiduciary rules above stated . . . the cause of action did not commence to run until plaintiff knew *or should have known* of the breach." *Id.* at 597 (emphasis added). Moreover, while Plaintiff does cite several cases (mostly from Kentucky) that toll the statute beyond the "normal" inquiry notice period, these cases focus on the fact that the plaintiff's trust in the fiduciary actually *prevented* the plaintiff from having notice of the defendant's wrongdoing—their trust reasonably foreclosed suspicion.[6]

The distinction between the usual "discovery rule" and the rule allowing late discovery in fiduciary cases "is that in the latter situation the duty to investigate may arise later by reason of the fact that the plaintiff is entitled to rely upon the assumption that his fiduciary is acting in his behalf." *Eisenbaum v. W. Energy Res., Inc.*, 218 Cal. App. 3d 314, 325 (1990) (quoting *Bedolla v. Logan & Frazer*, 52 Cal. App. 3d 118, 131 (1975) (emphasis omitted). Ultimately, as Plaintiff acknowledges, the reason for the somewhat-different treatment of "discovery" in the fiduciary context is that "[w]here a fiduciary relationship exists, facts which ordinarily require investigation may not incite suspicion." *Eisenbaum*, 218 Cal. App. 3d at 325 (internal citation omitted).

---

[6]For example, in a case involving a fraudulent land conveyance, *Lemaster v. Caudill*, 328 S.W.2d 276, 281-82 (Ky. 1959), the Kentucky Supreme Court did not apply normal "constructive notice" rules to the defendant's recording of a deed, because the fiduciary relationship and the defendant's actions "lulled [the plaintiff] into a false sense of security." *Id.* at 281. Instead of running the clock from when the deed was filed, the court found that the clock ran from the time that one of the rightful heirs checked the county records and found a record of the deed in controversy. *See id.* at 279. The Kentucky Supreme Court later explained that the actual notice requirement in the land conveyance context is necessary because "persons in a confidential relationship do not have the reason or occasion to check up on each other that would exist if they were dealing at arm's length." *McMurray v. McMurray*, 410 S.W.2d 139, 142 (Ky. 1966).

Plaintiff therefore contends that because her mother was a fiduciary, "inquiry notice" is inapplicable because she had no duty to inquire. But this is not so. *Eisenbaum* states that "[t]he existence of a trust relationship *limits* the duty of inquiry"—it does not completely eliminate it. *Id.* at 324 (emphasis added). The duty is limited to the extent that a plaintiff is "entitled to rely on the statements and advice provided by the fiduciary." *Id.* The duty to inquire does not arise until the facts—considering the fiduciary relationship—warrant suspicion. *See id.* (citing *Hobbs v. Bateman Eichler, Hill Richards, Inc.*, 164 Cal. App. 3d 174 (1985)). However, "once a plaintiff becomes *aware* of facts which would make a reasonably prudent person suspicious, the duty to investigate arises and the plaintiff may then be charged with knowledge of the facts which would have been discovered by such an investigation." *Hobbs*, 164 Cal. App. 3d at 202.

Here, if Plaintiff had learned of the peculiar activity in the joint account and the existence of checks with her name on them, but had asked her mother and relied upon her mother's assurances that everything was fine, this rule would be applicable. Rena would not be penalized for trusting her fiduciary and failing to see through the lies in order to investigate. The district court correctly applied this rule in its opinion: the court found that the *first* time Rena was told about the settlement—by her sister in April 2002—that the clock did not begin to run because her mother denied it and "Rena apparently believed Rhonda's explanation."

Instead, the district court found that Rena had notice of wrongful conduct on November 29, 2002, when Rena admits she learned that checks, in her name, from an annuity company, "were being signed, deposited, and withdrawn." Rena testified at her deposition that at this time, she did not understand what all of this meant, and was "trying to figure out what was going on." We find

- 25 -

that, given the fiduciary relationship with her mother and our duty on summary judgment to view all facts in the light most favorable to the non-moving party, the district court inappropriately attributed knowledge to Rena as of November 29, 2002, when she had simply learned of the checks' existence. At this time, arguably, Rena could have believed that the funds were not truly hers, that her mother had simply banked on her behalf, or that a legitimate explanation was possible.

But the district court's determination was only off by a matter of days. Starting with the discovery of the checks, it does not appear that Rena was still trusting and relying upon her fiduciary. *See Mills v. Forestex Co.*, 108 Cal. App. 4th 625, 648 (2003) (noting that the discovery rule is an objective test, looking to what a reasonable inquiry would have revealed). The facts show that, upon speaking with the bank, Rena immediately wrote a letter to Symetra, stating that she was not the one who had deposited or withdrawn the funds, and she promptly received information in return that told her the full details of the settlement and amounts of the funds involved. She promptly removed all funds from the joint account and placed them in a private one. All of this occurred between November 29, 2002 and December 6, 2002.

By December 6, 2002, Rena knew (1) that checks with her name had been deposited and withdrawn from an account that, besides herself, only her mother had access to; (2) the checks had come from an annuity fund to satisfy "payment obligations under a settlement agreement for a personal injury or wrongful death claim," despite her mother's prior statements that no settlement existed; (3) the amounts and dates of each check made out to Rena, and the fact that she never received these funds; (4) the exact details—including actual copies—of the settlement agreement for her benefit; (5) that at least $173,000 of these funds had been deposited into the joint account,

but less than $70,000 now remained. While she may not have understood the full details of the alleged fraud, Rena had "[become] aware of facts which would make a reasonably prudent person suspicious." *Hobbs*, 164 Cal. App. 3d at 202. Moreover, Rena was subjectively suspicious, as she responded by transferring the money and removing the funds from her mother's reach. Rena Dep. at 77, 170, 242. Therefore, no later than December 6, 2002, the duty to investigate did arise, and the statute of limitations began to run.[7]

Consequently, under the three-year statute of limitations, Rena's claim was required to be filed no later than December 6, 2005. Her claim was fifteen months too late. The district court correctly determined that Rena Swanson's claims were barred by the applicable statute of limitations. Therefore, we **AFFIRM** the district court's grant of summary judgment.

---

[7]There are no hard and fast rules for determining what facts or circumstances will compel inquiry by the injured party and render her chargeable with knowledge. *See Dabney v. Philleo*, 38 Cal. 2d 60, 60-65 (1951). Ordinarily, it is a question for the trier of fact. However, the district court was addressing a motion for summary judgment, and thus, once Defendant demonstrated the absence of genuine issues of material fact, Rena's burden was to show more than "some metaphysical doubt," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and to produce evidence showing that a genuine issue remained. *See Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). Because Plaintiff's own statements show that she was aware of the information given to her by Safeco and acted upon it at an ascertainable date, no rational fact finder could find for her, and it was appropriate for the district court to determine that Rena was on notice as a matter of law. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).