## McCoy v. Arena et al.

Oct. 12, 1943.

Cleon K. Calvert and W. L. Hammond for appellant.

H. H. Owens for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Reversing.

Appellees, Annette Arena, Mrs. McAlister, daughters, Alice and Fennie Reeder, granddaughters, of J. L. Reeder, upon the latter's death became the owners of undivided one-third interests in about 400 acres of land in Knox County. We gather from the record that none of the owners ever occupied the land. Appellant exhibits the following, which he claims Annette and her husband executed and delivered to him:

"This contract made this 1st day of December 1934, between Annette and Jim Arena, parties of the first part and Pinquard McCoy, of the second part; Witnesseth: For and in consideration of $1.00 cash in hand and other good and valuable consideration, the receipt of all of which is acknowledged, the first parties have sold and agreed to convey to the second party the following described real property; one-half of a one-third undivided interest in a tract of land of approximately 400 acres and being the same land which J. L. Reeder owned at the time of his death and which he willed to his wife during her life and at her death to his three children and their heirs, the first party being one of the heirs.

"Witness this day and date above written.

"(Signed)   Annette Arena
"Jas.  G.  Arena.

"Witness:  Shea R. Seal"

Acting under the contract, and the fact that the owners had agreed, he took possession, and so remained until February 4, 1940. On this date plaintiffs filed an ordinary action alleging joint ownership, and that McCoy had entered under a lease contract by which he bound himself to look after and preserve the property, and give plaintiffs one-half of all crops produced and to pay all taxes. The petition charged failure to comply with the alleged lease contract, and demand for possession. There was a charge that McCoy had cut and removed timber of the value of $1,500. Based on these charges, they prayed for damages in the sum named, and an order of forthwith possession.

In answer, counterclaim and cross-petition, appellant denied Mrs. Arena's ownership of more than a one-sixth undivided interest in the land in question (by reason of the title bond), and specifically denied each allegation of the petition. Affirmatively he plead that under his contract he was the owner of an equitable title to the undivided one-sixth interest, and in legal possession; that under the terms of his contract the Arenas obligated themselves to convey the 1/6 interest, and that his demand for conveyance had been refused. He alleges that the lands in question are susceptible of division. As counterclaim he alleged that during the time of his occupation he had made lasting improvements, paid the taxes, and kept the property in good condition. He asked that J. G. Arena be made party, and that he and the other Reeder heirs be required to answer, and that the Arenas be required to conform to their contract. On his motion the case was transferred to the equity docket.

Appellant's pleading drew an answer from J. G. Arena, and reply, which in effect denied the allegations of McCoy's answer, Arena alleging that he did not sign the writing. That Mrs. Arena not knowing import of the writing had never agreed to convey title to McCoy, "but did agree to lease, and insofar as said writing departs from that intent it is either a fraud on the part of defendant, or a mutual mistake," asking that the contract be cancelled, or reformed so as to manifest the intent claimed.

McCoy denied and plead that more than five years had elapsed between the delivery of the title bond and that the parties had a copy of the instrument and knew of its purpose, hence the five year statute bars the charge of fraud. Depositions were taken and the cause was submitted, the court adjudging that the writing sued on was not signed by the plaintiff J. G. Arena, hence void under Ky. Stats., sec. 2128. The contract was cancelled and plaintiff adjudged possession. The claim of plaintiffs for damages was dismissed, and the matter is before us on McCoy's appeal.

As the case is presented to us in briefs, the question to be determined is whether or not the chancellor erred in holding that the document had not been signed by the husband. Appellee contends that the chancellor correctly so held, and relies on the rule of this court that

it will not reverse a judgment of the chancellor where the evidence is such as to create no more than a doubt in our minds. Lawrence v. First State Bank, 279 Ky. 775, 132 S. W. (2d) 60; Bevins v. Damron, 274 Ky. 74, 118 S. W. (2d) 136. Appellant contends that the proof shows that the husband did sign.

It is argued as a matter of law that since appellees based their action on fraud, the action was barred because they had a copy of the contract; knew of its contents and of the alleged breach, and did not timely assert their rights.

Mrs. Arena and McCoy are first cousins, and McCoy said that three or four years prior to the execution of the paper he boarded Mrs. Arena and her daughter for the better part of two years, and that this maintenance was the other consideration for the contract. She denies the consideration. He says he was told to have prepared what he termed a "deed;" that they "kept after him" until he finally agreed to move to the place. The two made a trip to McCoy's home and suggested preparation of a deed; an attorney prepared the paper exhibited. McCoy was positive that Mrs. Arena signed at her home after reading it. Mr. Arena was working at the railroad yard in Corbin, and McCoy says that he, Seal and Mrs. Arena drove to the yard where the husband read and signed duplicates, the grantors keeping either the original or copy. Both are filed as exhibits. Seal, appellant's son-in-law, says that he went with McCoy from Pineville to Corbin to have the paper signed. He says Mrs. Arena signed at home, and the three went to the railroad where the husband signed. He was not certain as to the reading.

Mrs. Arena testified twice. In her first deposition she denied that she had agreed to sell to McCoy a part of her interest, but that she agreed for him to go on the place, pay the taxes, and give her a part of what he got "out of vegetables and things; something every year." That McCoy was drinking considerably at the time; "was down and out," and she wanted to help him. This was a verbal agreement, and "that this piece of paper (which she says she did not read) that turned out to be a title bond," she thought was merely a writing to give McCoy authority to deal with trespassers. She admits that he paid the taxes "up till last year," and says had furnished them with "one-half a bag, and maybe a bush-

el and a half of apples," and his wife had paid $30 or $40 the first year, though there was no agreement for cash payments; she never learned that the paper purported to be a title bond until the early part of 1942; that her husband had never seen the paper, as it was against his wishes that McCoy be dealt with. She admitted that she had remained at the McCoy home for a while by invitation, but that her upkeep was no part of the consideration for the rental or the title bond. She admits the signing of the writing in the presence of McCoy and his son-in-law. In this deposition she says she did not see her husband sign, and did not know whether he signed or not, and says she did not go to the railroad office, as she remembered.

She also admits that she placed the paper somewhere, and never looked it up until in January 1942, then to find out what sort of a document she had signed. It appears that about the time the suit was filed a producing oil well was brought in on the tract, which had been under lease since prior to the execution of the paper, perhaps in 1929, but the royalties had been paid to the heirs, McCoy receiving no portion.

On re-direct examination she said that the name of her husband was not in his handwriting, and she "thinks" she signed it, when he was not present, because she did not want him to know that she had rented the property to McCoy. The husband testified that he knew nothing of the paper until he happened to be going through his desk "and it dropped out of a book to the floor;" this was in January 1942. He says he neither signed it nor authorized any one to sign for him; that his signature as appeared, resembled the handwriting of his wife, and that there was great similarity of Seal's attesting signature, and that of both himself and wife. He said he usually signed his name "J. G. Arena," and never signed "Jas. G. Arena," as it appeared on the documents. He signed for comparison the carbon copy.

Mrs. Arena gave another deposition in which she said that she had signed her husband's name to the document, and failed to tell her husband, because she thought it was no business of his; that she did not tell him that McCoy and Seal were at her home on the day she signed.

Counsel for appellee in support of insistence that the court should follow the finding of the chancellor,

quotes from Oliver v. Noe, 232 Ky. 809, 24 S. W. (2d) 592, 595, as follows: "It is the invariable rule of this court not to reverse a judgment of the chancellor where the decision is dependent upon the credibility of opposing witnesses, or where the evidence is such as to make doubtful the truth of the matter involved." He fails, however, to add: "Yet the rule is equally uniform that the court will weigh and judge the sufficiency of the evidence for itself, and where it is convincing the one way or the other, and it is apparent that the chancellor has erred in his conclusion, the judgment will be reversed. Smith v. Boone, 222 Ky. 1, 299 S. W. 1059." As we said in that case, "We are constrained to apply that rule" here as we did in reversing the judgment in that case. In so doing we are not required to go to the length of discounting the testimony of Mrs. Arena; she did that herself. She was, according to her own testimony, concealing the transaction with McCoy, even her version of it, from her husband. She was first uncertain as to whether she signed both copies; she said that she did not think her husband signed the copy McCoy kept. "I don't know that he signed either one of them."

On re-direct examination she said she "thought" she signed Mr. Arena's name, because "it looks more like mine." It was not until after the husband testified that she refreshed her memory and recalled that she "was the one who signed his name." Whether she intended to make the answer or not, and as bearing on her knowledge of the purport of the document, she said that she "saw an attorney" about the time the paper was signed.

McCoy and Seal, unimpeached in any way, were both positive as to the affixing of signatures. McCoy was under the impression that he was getting a deed, and it could hardly be presumed that he would have overlooked having the husband sign. Seal, who was not directly interested in the matter, was positive as to the signing by both parties. During the taking of depositions Mr. Arena complied with his counsel's request to sign the copy of contract just below the signatures as they appeared thereon. While there is some similarity in all the signatures, including that of Seal's, as intimated by Mr. Arena, any notion that Seal did all the writing was eliminated by Mrs. Arena's testimony. We have no way of knowing just to what extent the chan-

cellor considered or compared the writings; we have given them close consideration, and find it not difficult to conclude that the "sample" writing and that of the husband's signature were by the same hand.

Taking up briefly the matter of limitations: We find from the pleading that following Mrs. Arena's plea of fraud or mistake, denied by McCoy, the latter plead the statute of limitations (5 years) and such facts as would not justify its interposition under the ten year statute, to which there was no controverting pleading filed. Notwithstanding this, such proof as was adduced in an effort to show failure to discover the intent of the paper, is of no compelling effect. The paper was admittedly signed by Mrs. Arena and was in her possession at all times. She assumed, not that it was a contract of rental, but a paper giving McCoy the right to care for the property and prevent trespassing, which he could have done since he was a tenant in possession according to Mrs. Arena.

It would go far afield to apply the rule as to lack of opportunity to discover the fraud under the facts in this case. In many cases in which we have construed the two statutes of limitations in respect of fraud or mistake, we have uniformly held that if the five year period is allowed to elapse, the one relying on the defense must allege and prove that the fraud or mistake was not only not discovered within the period, but that the same could not have been discovered sooner by the exercise of reasonable diligence. Gragg v. Levi, 183 Ky. 182, 208 S. W. 813, and cases cited; Forman v. Gault, 236 Ky. 213, 32 S. W. (2d) 977; House v. Farmers Bank, 269 Ky. 80, 106 S. W. (2d) 113.

Being of the opinion that the weight of the evidence shows that the paper relied upon by McCoy was valid, and his plea of limitations as to the defense of fraud was good, we are compelled to reverse the judgment of the lower court with directions to set aside the judgment, and for such further orders as are consistent with the opinion.