**Bertha LEMASTER, Administratrix of the Estate of Prock Lemaster, et al., Appellants,**

v.

**Abbie CAUDILL et al., Appellees.**

Court of Appeals of Kentucky.

May 8, 1959.

Rehearing Denied Nov. 13, 1959.

J. K. Wells, G. C. Perry, 3rd Paintsville, for appellants.

Marcus Mann, Arnett Mann, Earl Cooper, Salyersville, for appellees.

MOREMEN, Judge.

This is an appeal from a judgment entered on a verdict which cancelled, because of fraud, a deed that conveyed to Prock Lemaster all mineral rights which had been owned by J. W. Lemaster who died intestate. Prock Lemaster was one of nine children of J. W. Lemaster, and all the heirs of J. W. Lemaster, including descendants of his deceased children, signed the deed with the exception of one child. Both parties in their briefs have referred to appellants as defendants and to appellees as plaintiffs and we will use the same nomenclature.

The suit to cancel the deed and for an accounting was filed by all the heirs who signed the deed except two children of a deceased child. Apparently by agreement an order was entered which reads in part as follows:

"At a pre-trial conference, it appearing and counsel for both plaintiff and defendants conceding, that the only essentially factual issue is that of fraud, it is ordered that this case be submitted to a jury on the sole issue of whether the plaintiffs and their ancestors were induced to execute the purported deed sought to be cancelled, by false representations, fraudulently made by defendant, Prock Lemaster and his agents, said issue to be submitted to the jury upon proper instructions covering the issue as developed by the proof."

An issue concerning limitations was reserved by the order and the amount of royalties paid and approved was also stipulated.

At the trial, the case was submitted to the jury which returned a verdict in favor of plaintiffs. The court passed upon the matter of limitations and judgment was entered cancelling the deed.

The trial of the action lasted six days and the record filed here is large because the parties agreed to little that transpired.

The testimony is in sharp conflict and there are inconsistencies in some parts of the evidence offered by the parties in support of their own side of the case. A few things, however, are certain.

J. W. Lemaster, during his life, resided in the oil producing section of Magoffin County with his son, Prock Lemaster, who was the principal defendant in this suit. The home was on or adjacent to land which produced oil royalties for J. W. Lemaster. Prock Lemaster died after the verdict was returned, but before judgment was entered. The action was revived.

J. W. Lemaster died on April 16, 1949, and at the time of his death, his oil wells were producing little, and often the royalties were no more than $27 per month. He was buried on April 18, 1949, and his descendants gathered from various parts of the state. Some who were non-residents also attended the funeral and burial of their father and grandfather. From that time on, we find that the various sets of witnesses seldom agreed as to what happened.

After the burial, according to testimony introduced in behalf of defendants, Lonnie Lemaster, one of the children (who died a short time later) suggested that since Prock Lemaster and his wife had cared for J. W. Lemaster through his declining years and in his last illness, the royalties should be given to Prock Lemaster for looking after his father. It was Prock Lemaster's contention—and he is corroborated to some extent by the heirs of two of the children of J. W. Lemaster—that all the children, except one daughter, Julia Smith, agreed to make the conveyance. The witnesses for the other heirs and plaintiffs denied that any such suggestion was made.

Shortly afterwards, the group dispersed with the exception of three sisters, Flora Weiler, Abbie Caudill, and Lulu Grace, who stayed over night with Prock Lemaster.

On April 30, 1949, a deed dated April 20, 1949, was recorded and this deed bore the signatures and acknowledgments of

the children of J. W. Lemaster or their survivors with the exception of one daughter, Julia Smith. Neither side contends that the deed was signed by all parties at the same time, but all the children, with the exception of one or two of the grandchildren who testified for the defendants, are unanimous in their claim that they did not know the character of the instrument they were signing and placed great reliance upon Prock Lemaster when they put their names to the instrument.

All versions are not the same. The first group who signed included the three sisters who had stayed all night after the funeral. They testified that the following morning Prock Lemaster asked them to go with him to Salyersville and designate him to handle the estate, pay the funeral expenses and other debts, and divide the money which belonged to the estate. They went with him to Salyersville and he left them in the car while he went into the courthouse. When he came back to the car, they returned to his home and the following morning they again went to town where they met Flora Weiler, Sis Arnett, and Will Isaacs (who had some interest in the estate) and accompanied Prock Lemaster to the clerk's office where they were told by the clerk to "sign here" which they did.

They testified that they had been led to believe by Prock Lemaster that they were signing the papers in order that their brother could get the money to pay the funeral expenses and to divide the balance between the heirs. The party then went to the bank where a safety deposit box owned by the deceased person was opened by a bank official and Prock Lemaster who also had a key to the box. The money was removed. The parties then journeyed to Paintsville where the funeral expenses were paid and, after the debts had been paid, each one received a proportionate share of the $7,000 found in the box.

Thereafter, Prock Lemaster working with Richmond Salyer, clerk of Magoffin County, and Lonza Reed, obtained the signatures and acknowledgments of the various other heirs. Each witness, when testifying, gave some variation of the facts which induced his signature, but generally it was to the effect that none of them read the instrument, that it had not been read to them, and they signed it because they relied upon their brother to do the right thing. Others testified that they observed only a paper with some signatures on it and were told that it related to the administration of the estate, or that if they signed it, they would get their share of the estate.

It is interesting to note that Lonza Reed, clerk of Johnson County, also did not read the deed, but was under the impression that it was some sort of paper that had to do with the division of the estate. Two other purported signatories denied that they had signed the deed at all. The deed was later destroyed by fire and we have only the recorded copy.

The defendant, Prock Lemaster, testified that Lundy Lemaster proposed the agreement after the funeral and all except Julia Smith seemed to be in accord. We will illustrate his testimony by short excerpts from the transcript.

"Q. That was your brother Lundy. A. Yes, sir.

"Q. Was anything else said there by any of the rest of the heirs? A. Yes, sir, they talked it through one another and I reckon they all agreed to it, except one sister, before they left the house that they would do it. * *

"Q. Did any of your sisters other than her, which you just named as being in the room, or any of your nieces and nephews who you named as being in the room voice any objection to Lundy Lemaster's motion or proposition? A. I didn't hear any of them.

"Q. Were they in agreement or disagreement with Lundy Lemaster's motion? A. Seemed to be was in agreement with him."

He also testified in connection with the deed that Mr. Alex Adams, an attorney, had prepared—and further:

"Q. What was this instrument that he drew up—was it a blank piece of paper, or what was its nature? A. It was a deed.

"Q. Did you read it, Prock? A. Well, not particular. I read part of it and part of it I guess I didn't.

"Q. From what you read of it, did it read like a deed, or administrator's papers? A. It was a deed."

Prock Lemaster's testimony as to the agreement after the funeral was corroborated by Ben Alley, the son and only heir of Prock's sister, Mrs. John Alley, and by the father of Ben Alley, all of whom would have profited had the deed been set aside. Oscar Weiler, Jr., also a nephew, testified that there had been a general discussion concerning the royalties and an agreement to deed them to Prock Lemaster. Also, witnesses were introduced by defendants to show that plaintiffs had made statements contrary to the position they took on the trial of this case. The testimony for both sides presents the old problem of which set of witnesses to believe.

At the time of J. W. Lemaster's death, the wells had become depleted and the royalty check was usually in an amount between $27 and $50 per month. This area was being worked by the Petroleum Exploration Company. Adjoining the Lemaster property was the Lee Bailey tract, and Prock Lemaster, an oil pumper, had worked on the Bailey property for several years prior to the death of J. W. Lemaster.

In 1941, the producers had experimented with re-pressuring the wells by gas and air, but had had little success. In 1948, they changed over to the water flooding system which necessitated building reservoirs in order to purify the water before it was injected into the oil sand. There was no great increase in production for a period of about 17 months on the Bailey tract. It was even longer before the pressure was felt in the wells on the Lemaster property. Later—we are not too sure about the exact time, but probably in 1951—the Lemaster property began to produce in great quantites and the royalties amounted to about $2,000 per month.

In 1953, Dora Adams, one of the heirs who had lived in Paintsville, moved to Salyersville, and there heard rumors which led her to believe that Prock was claiming and receiving all the royalties. She conferred with several of her relatives and had the records checked in the county clerk's office where they found no settlement of the estate, but they did find a record of the deed in controversy. Other relatives (a majority of them lived out of Kentucky) were either informed or they discovered the same facts, and on July 7, 1955, the complaint which initiated this action was filed.

Defendants argue as grounds for reversal: (1) the evidence of fraud is neither clear nor convincing; (2) equity will not protect plaintiffs against their own folly; and (3) the action for cancellation, which was filed more than six years after recordation of the deed, is barred by limitations.

Under the first assignment of error, it is pointed out that none of the plaintiffs was incompetent or illiterate and that the testimony of all of them differed in important respects. Some of the plaintiffs testified that the instrument which they signed was a blank piece of paper containing only some other signatures; while others admitted that there was typewritten matter above where they signed. Defendants insist that the witnesses were forced to swear, in order to cancel the deed, that they had heard no conversation about making a deed to Prock Lemaster, for if there had been a discussion of such a deed when Prock Lemaster and a notary told them to sign the papers, they obviously would have known what they were signing. Defendants conclude this argument with the deduction that the testimony is so manifestly incred-

ible that it should be denied evidentiary weight, and rely upon cases which state that proof of fraud to authorize cancellation must be clear and convincing. McAllister v. Lambrose, 221 Ky. 44, 297 S.W. 936; Clarke v. Salyersville National Bank, 260 Ky. 676, 86 S.W.2d 674.

It is true that we have many times held that such proof must be clear and convincing but the cases have been somewhat vague in designating the person who must be convinced.

In the case at bar, the jury certainly were convinced by the evidence offered by plaintiffs and so also was the trial judge who entered judgment on that verdict. Under such a situation where one group must be believed and the testimony of the other group rejected, we would be hesitant, even if we were inclined that way, to substitute our surmise for the finding of the jury and the court.

█ We have attempted in the first part of this opinion briefly to outline the respective versions of each party. We have attempted to show only obvious inconsistencies in each side of the case. The overall description of what transpired as given by one side is controverted in all major particulars by the other, and the decision in this case must turn upon the pivotal point fixed by the veracity of the witnesses. The courts have always been glad to delegate this difficult task to juries. We believe the jury had ample convincing evidence upon which to base their verdict and we are not disposed to disturb it.

Defendants next contend that equity will not protect plaintiffs against their own folly and develop the theory that even though the law imposes but slight duty of care on the victim of fraud, yet even in the presence of fraud, if the negligence of the victim is so gross that it is apparent that he is the victim, not of the fraud, but of his own folly, equity will not interfere either by the way of reformation or cancellation. They rely principally on Kreate v. Miller,

226 Ky. 444, 11 S.W.2d 99, 102, where it is said:

"One sui juris and in possession of his faculties, contracting at arm's length, and who is able to read and write, is not permitted by the law to rely exclusively upon the statements of the other contracting party as to the contents of a writing which the former signs. There must be something said or done by the party charged with the fraud which would be reasonably calculated to disarm or deceive one of ordinary prudence and to prevent him from using such diligence as an ordinarily prudent man would use in the execution of a contract under the same or similar circumstances. When, therefore, the law speaks of misrepresentations by the party charged with the fraud, it means that the representations must have been not only untrue, but also made under such circumstances as would be reasonably calculated to deceive one while exercising ordinary care for his own protection."

█ It will be noted that in the foregoing quotation the rule announced is applicable where the parties are "contracting at arm's length." When we consider plaintiffs' theory of the case, certainly the parties were not on equal footing because they were relying upon the faith that their brother would not mislead them. We believe that in the absence of any showing that Prock Lemaster had ever done anything which would cause his brothers and sisters to lose faith in him, the relationship was fiducial and they had the right to rely upon him. This issue was submitted by the instructions.

Finally defendants take the position that when Prock Lemaster recorded his deed, the facts of the alleged fraud were no longer exclusively within his knowledge and state that the recordation of a deed, which on its face reveals mistake or fraud, starts the limitations running although plaintiffs may not have had actual notice or knowl-

edge of the fraud. Defendants rely upon the cases of: Elkhorn Coal Corp. v. Hite, 225 Ky. 735, 9 S.W.2d 1083; Jennings v. Fain, 226 Ky. 290, 10 S.W.2d 1101; Hollifield v. Blackburn, 294 Ky. 74, 170 S.W.2d 910; Morgan v. Hughett, 301 Ky. 409, 192 S.W.2d 197; McCoy v. Arena, 295 Ky. 403, 174 S.W.2d 726; Stepp v. Stepp, Ky. 1956, 288 S.W.2d 337.

The pertinent parts of the Statutes of Limitations are these:

KRS 413.120

"The following actions shall be commenced within five years after the cause of action accrued * * *

"(12) An action for relief or damages on the ground of fraud or mistake."

KRS 413.130

"(3) In an action * * * referred to in subsection (12) of KRS 413.-120, the cause of action shall not be deemed to have accrued until the discovery of the fraud or mistake. However, the action shall be commenced within ten years after the time of making the contract or the perpetration of the fraud."

KRS 413.190

"(2) When a cause of action mentioned in KRS 413.090 to 413.160 accrues against a resident of this state, and he by absconding or concealing himself or by any other indirect means obstructs the prosecution of the action, the time of * * * obstruction shall not be counted as any part of the period within which the action shall be commenced * * *".

■■ The cases cited by defendant offer some support for the proposition that recordation of a deed starts the running of the statute, particularly where the parties have dealt at arm's length, but the facts in those cases are not the same as those presented here and the cases generally may be distinguished from the instant case because: (a) the ten year period had passed; (b) there was no fact indicating that a fiduciary or confidential relationship existed; or (c) there was no fraud in the inception of the contract. We believe that we are called upon here to decide whether in cases where a confidential relationship exists and there has been fraud in the inception of the contract, constructive notice by way of recordation may be construed to mean actual discovery of the fraud or mistake.

The nearest authority we find is presented by the opinion in Loy v. Nelson, 201 Ky. 710, 258 S.W. 303, 304, where a son had made an oral agreement to purchase land, but, being unable to pay for it, he persuaded his mother to pay the purchase price, and promised that he would have it conveyed to her. He had the land conveyed to himself. The mother moved upon the premises. The court held that the son and his heirs were estopped to plead the running of the ten year statute of limitations although he had recorded the deed. The court said:

"It is true that the recording of a deed constitutes constructive notice to the public; but, in view of the close, confidential relations existing between the mother and son, of the fact that after the deed was made that he informed her that it was made to her, and that he was taking care of it at his house, and in addition thereto his placing her in possession of the land itself and acknowledging her title thereto, it appears that the old lady was lulled into a false sense of security."

It will be noted that the estoppel applied even to the ten year statute. Defendants took the position that if fraud in the inception tolled limitations, there would be no limitation on suits to cancel deeds for fraud. That apparently would be true under the facts in the Loy case. Here we are presented with a lesser problem and are not called upon to re-examine the Loy

case because here the action was brought within the ten year period. Ordinarily we believe that if no matters of estoppel are shown, the ten year period would preclude any suit resulting from the perpetration of a fraud.

Under the circumstances of this case, where plaintiffs profess that they did not know any deed was signed, we have concluded that the mere recordation of the deed was not actual discovery of the alleged fraud.

Judgment affirmed.

Montgomery, C. J., dissenting.