**Ronnie NORWICH and Jennifer Quammen, Appellants**

v.

**Allen NORWICH; Debra Norwich; and PNC Bank, Appellees**

NO. 2014–CA–000216–MR

Court of Appeals of Kentucky.

RENDERED: APRIL 17, 2015; 10:00 A.M.

BRIEFS FOR APPELLANTS: Mark W. Wegford, Alexandria, Kentucky

BRIEF FOR APPELLEES, ALLEN NORWICH AND DEBRA NORWICH: Robert E. Bathalter, Alexandria, Kentucky

BEFORE: J. LAMBERT, STUMBO, AND TAYLOR, JUDGES.

## OPINION

J. LAMBERT, JUDGE:

Ronnie Norwich and his former wife, Jennifer Quammen, have appealed from the Campbell Circuit Court's January 2, 2014, order entered following a bench trial. The circuit court found that Ronnie committed fraud against Allen Norwich and Debra Norwich, and it also dismissed a claim for punitive damages and a cross-claim for trespass. Having carefully reviewed the record and the parties' arguments, we affirm.

Ronnie and Allen Norwich are brothers; Allen is married to Debra, and Ronnie was married to Jennifer until their marriage was dissolved in 2013. Ronnie and Allen have two other siblings, Linda Hunter and Caroline Meyer. In 1974, Ronnie and Allen's parents, Frank and Ilena Norwich, purchased a 4.87–acre tract of land in Melbourne, Kentucky, via a land contract. They paid off the land contract in 1986 and obtained a deed to the property. In 1989,

Ilena and Frank transferred to both Ronnie and Allen a one-half undivided interest in the land. Frank passed away later that year, and in 1998, Ronnie and Ilena replaced the original mobile home with a double-wide mobile home titled in both of their names. Ronnie (and Ilena) and Allen continued to live on the property in their respective mobile homes, and they both had outbuildings on their portions of the property.

In 1991, Allen needed funds to open a video store in Silver Grove. The parties agreed to mortgage the 4.87 acres to obtain a $15,000.00 line of equity to fund the video store. Ronnie, Allen, and Ilena signed the mortgage, and Allen made the monthly payments on the line of equity because the funds were primarily used for his video store. Ronnie received $6,500.00 of the proceeds to purchase a pickup truck. A subsequent $50,000.00 mortgage was taken out in 2002, in part to pay off the line of equity. Ronnie made the payments for the 2002 mortgage. Further mortgages were taken out in 2003 and 2004. These mortgages, along with a 2004 deed, by which Allen and Debra purportedly transferred their interest in the property to Ronnie, and a 2004 statement, in which Ronnie purportedly promised to give Allen back his half of the property, became the subject of the dispute between the parties.

In 2012, Allen and Debra filed a complaint against Ronnie, Jennifer,[1] and PNC Bank related to these transactions. In the complaint, Allen and Debra alleged that Ronnie forged or fraudulently obtained their signatures for the 2004 deed and then Ronnie and Jennifer signed a $93,750.00 mortgage on the property. They also alleged that Ronnie and Jennifer committed fraud by making material false representations related to the ownership of

---

1. Ronnie and Jennifer were still married at this time.

the property. Allen and Debra requested that the court quiet title to their one-half undivided interest in the property and that the mortgage be released as to their portion of the property. They also requested punitive damages. PNC Bank was named based on the refinanced 2006 mortgage in the amount of $92,000.00. Allen and Debra requested that their interest be removed because it was obtained via a fraudulent deed. Allen and Debra requested in excess of $4,000.00 each in compensatory damages and in excess of $4,000.00 each in punitive damages. Ronnie and Jennifer answered the complaint and instituted a counterclaim against Allen and Debra alleging trespass. Likewise, PNC answered the original complaint and filed its own cross-claim and counterclaim seeking a judgment in the amount of $90,734.81, plus interest and other fees, and protection of its mortgage lien interest.

The matter was scheduled for a bench trial on October 28, 2013. At the outset of the trial, PNC Bank stated that it had reached a stipulation with the parties to the effect that if Allen and Debra prevailed, the mortgage would be wiped out as to their portion of the property. If Ronnie won, the mortgage would remain on the entire property. In relation to its counterclaim and cross-claim, PNC stated it would voluntarily dismiss these formal claims with the right to refile, depending on the result of the trial.

Allen was the first witness to testify. Allen and Debra were married in 1981, and they lived on the property in a double-wide mobile home. After he and Debra moved to the property, they made several improvements. They built a garage with a concrete port in front and on the side of the garage as well as decks on the front and back of the home. His parents had purchased the property on a land contract in the early 1970s, and they received the deed in 1987 when they paid off the contract. His parents replaced the original mobile home with a double-wide mobile home in 1988. While this was being put in place, his parents and Ronnie lived with him and Debra in their mobile home on the property. When his father became ill, he and his mother deeded the property to Allen and Ronnie.

Allen started his video store in 1991 in Silver Grove, Kentucky. He paid $53,000.00 for the building and had to get a loan to pay for it. Ronnie worked with him at the store. His niece and nephew as well as his wife and mother also worked at the store at times. In order to open the store, Allen needed to borrow $15,000.00 via an equity line of credit, which was taken against the land where they lived. Allen, Ronnie, and their mother signed the mortgage. Ronnie got $6,500.00 from the line of credit to purchase a truck, and Allen used the remaining funds to purchase movies and games. Allen made the monthly payments.

In 2002, Allen, Debra, Ronnie, and Jennifer signed a mortgage in the amount of $50,000.00. Ronnie told Allen he was going to get a loan to pay off the line of equity. Allen did not know how much Ronnie was going to obtain with the loan. He recalled going to an office to sign the documents, but he did not have anything to do with obtaining the loan. They used the proceeds from the loan to pay off the $15,000.00 equity line of credit. At that time, $13,000.00 was owed on the line of equity; the parties decided to withdraw the additional $2,000.00 and split it among themselves. Allen did not make any payments on the $50,000.00 loan. Allen agreed that the 2002 mortgage was valid. In 2003, another mortgage was taken out by the four parties for $65,500.00. He did not remember this mortgage, but he testified that he and Debra probably signed the

document. Allen did not do anything to apply for this loan, and he did not get any money out of this loan.

In 2004, Allen stated that Ronnie asked him and Debra to sign a waiver on a single page of paper. He did not recall ever transferring his property to Ronnie or seeing or signing a deed doing so. Allen did not recall Ronnie offering to purchase his half of the property for $5,000.00, but he testified that Ronnie gave him a check for $5,000.00 in August 2004 for money he owed him, in part for damage to a pool liner by Jennifer's dog. There was never any discussion about selling the property to Ronnie. Allen continued to make improvements to his home after that time, including carpeting the home, tiling the bathrooms and kitchen, putting in a wood-plane floor in the dining room, painting, remodeling both bathrooms, and installing a new roof. He found out about the property transfer when a friend said he saw in the newspaper that he had sold property to Ronnie. Allen asked Ronnie, who said, "How did you find out?" and "You weren't supposed to find out." Ronnie then assured him that nothing was going to change. The next day, Debra typed up a document for Ronnie to sign stating that he would give Allen back his half of the property. Allen and Ronnie both signed the document. Allen thought the 2004 deed was the waiver Ronnie had him sign, but he had never seen the first page of the document before. The front page of the deed noted that $1,000.00 was paid in consideration.

In 2011, the dispute regarding the ownership of the land reemerged. Ronnie told Allen that he and Jennifer were going to move to Texas, meaning Allen and Debra would have to move or buy him out. Allen went to the courthouse, where he found the 2004 deed that his sister, Linda, had notarized. Allen asked Linda about this.

She told him she had not notarized the document and signed a statement to this effect. Allen told Ronnie to sell his half and go, but Ronnie thought the land could not be divided. Allen went to John Barnett to discuss purchasing Ronnie's half of the property. Nothing came of this, and nothing happened for the next year. Ronnie did not move to Texas. In 2012, Allen received a letter from attorney Mark Wegford stating that he needed to move off of the property. Allen contacted an attorney, and he later filed the current lawsuit.

On cross-examination, Allen confirmed that he signed the last page of the deed, but he thought it was a waiver. Despite the place for the notary signature, Allen trusted his brother. He believed that other parts were added to the document after he signed it, if the deed was originally the waiver. He also did not believe Linda had signed the document. Regarding the statement, Allen said he saw Ronnie sign it and that he might have scribbled his name on it.

Debra testified that she and Allen were married in April 1981. Just prior to the marriage, they purchased the double-wide mobile home in which they currently live. It is now paid off. She and Allen purchased a video store in 1991, and she would work there a few days a week. Ronnie always worked the night shift, from 5:30 pm to around 10:00 pm. While she had initially denied signing a 2002 mortgage, Debra testified that she had co-signed a mortgage in 2002 to release a line of credit. She and Allen were not involved in preparing the 2002 mortgage and did not provide any financial statements. Regarding the evening of July 1, 2004, when Ronnie claimed the deed was signed, Debra did not recall a meeting at her house with John Barnett, Eric Hunter, his girlfriend, Allen, and Ronnie. She never saw John, Eric, or his girlfriend sign a docu-

ment as witnesses. She never discussed selling their property to Ronnie with Allen.

Debra did recall Ronnie coming to their house in 2004 to ask them to sign a waiver that would allow him to get a mortgage. They had been sitting on the couch watching television; no one else was home. Ronnie handed them one piece of paper to sign. After looking at the last page of the 2004 deed, Debra said it looked like the paper Ronnie brought to the house, but the deed had more words on it and included a first page. Debra said she and Allen did not have any reason to doubt what the document was. She recalled that Ronnie had given Allen a check for $5,000.00 to pay him back for various things, including damage to the pool. After they discovered the property transfer notice, Allen confronted Ronnie, and Allen told Debra that Ronnie admitted that he had falsified the document. Allen asked her to draft a document to memorialize this admission. Allen came back with the signed statement.

From 2004 to 2011, nothing happened with regard to the property. Ronnie came to their house in March 2011 when she was alone to tell her they might have to move in a year because he and Jennifer might be moving. She called Allen so that the three of them could talk. The conversation with Ronnie led her and Allen to seek advice from an attorney, who recommended doing a title search. They found the deed and saw that Linda had notarized the deed. They took it to Linda to ask about it, and she said she had never notarized the deed. Linda then drafted her own statement denying that she had notarized the deed. They received a letter from attorney Wegford in June 2012, which sparked the current lawsuit. On cross-examination, Debra admitted that she did not see Ronnie sign the statement that she prepared.

Linda Hunter testified that she became a notary in 2002 when she worked for the Newport Aquarium. She did not renew her notary when it expired in 2006. She took the job seriously and made sure to read a document before she signed it. She took an oath to not notarize a witness's signature on a document unless she saw the witness sign it. She only notarized five or six documents over the course of the four years. She notarized two documents at the Aquarium, and the others were car title transfers, including one for one of Ronnie's friends. Allen and Debra brought a copy of the 2004 deed to show her, and Linda told them that she had not notarized the deed. She prepared a statement dated March 11, 2011, to establish this. She denied that Ronnie had called her to notarize a deed. She said her notary seal was at work in her desk. She had only notarized car title papers in his house, and she would have brought her seal with her. On cross-examination, Linda continued to deny that she had signed the deed, but appeared to agree that whoever signed the document needed her seal and the date her commission expired. She believed the notary signature was falsely obtained, although she admitted that the signature looked like hers.

John Barnett and Eric Hunter also testified regarding the signing of the deed on July 1, 2004. John is a friend of Allen, Debra, and Ronnie, and he did not recall witnessing the signing of a deed at Allen's house that evening. He said that Allen's plan was to retire on the property. Allen had approached him in the past about purchasing Ronnie's portion of the property, and he had even spoken to Ronnie about this. However, Ronnie did not come back with any prices, and nothing further happened. Eric is Linda's son and the parties' nephew. Like John, Eric did not recall Ronnie coming in with a deed or witnessing the signing of a deed on the

evening of July 1, 2004. He thought the signature on the deed was his mother's.

Ronnie testified on cross-examination. He discussed the various land transfers and mortgages. He testified that the four of them, he, Jennifer, Allen, and Debra, obtained the $50,000.00 mortgage in 2002 because he had debts to pay. He did the work to obtain that mortgage and a subsequent one about six months later.

Ronnie's version of what happened on July 1, 2004, regarding the signing of the deed was as follows: When Ronnie went to talk to Allen about selling his property, Allen had just come from a bank where he had been turned down for a loan. Ronnie told him about the mortgage company's request that Allen be taken off of the mortgage, and Ronnie told him he only planned to purchase the land. Allen would still own the house and garage. Allen told Ronnie to come to his house after work because John, Eric, and Alison (Eric's girlfriend) were coming over to play games. They could sign all of the documents, including the witness sheet, at that time. Ronnie called Linda from the store to ask her if she could notarize deeds. She said she could and asked Ronnie to call her when he got to Allen's house. Ronnie went to Allen's house after he had gotten the paperwork from his house. Everyone except Debra was at the kitchen table, and Debra was sitting on the couch watching television. Ronnie said he came to get the documents signed and asked Eric, Alison, and John to witness the signatures. They all signed the witness form. Ronnie called Linda, who did not want to come over to Allen's house. He asked Linda if she needed to be there, and she said she did not once he told her who the witnesses were because she knew them and did not need to see them sign. Ronnie went to her house, and Linda came out in her pajamas with her seal. She notarized the deed on her kitchen table. She asked how much he paid Allen for his half of the property, but Ronnie did not want to tell her. The next day, Ronnie called the number on the card, and the mortgage company sent a person to pick up the deed. Ronnie said he made it perfectly clear to Allen that he was not purchasing the mobile home. He did not tell him he would not have to move the mobile home, and told him instead that he would have to move when he and Jennifer decided to sell the property.

Jennifer testified next, also on cross-examination. She and Ronnie were married in 2000. She had been ordered to pay $16,000.00 in restitution to a former employer. The last payment was made in August 2004. She started graduate school in Iowa in the fall of 2004. Jennifer did not recall any specific details about the signing of the mortgages in 2002, 2003, or 2004. She thought it was reasonable to conclude that some of the proceeds from the 2004 mortgage went to pay off the remainder of her restitution obligation. The divorce from Ronnie became final in August or September of 2013.

At the conclusion of the testimony presented by Allen and Debra, the court directed a verdict in favor of Jennifer on the fraud claim due to lack of evidence.

For the defense, the first witness to testify was Ronnie. He testified in more detail about the mortgages and how they were taken out on the property. He stated that he actually saw Allen and Debra sign the deed. Related to the trespass claim, Ronnie testified that he told Allen in 2011 that he was going to have to move off of the property. And in 2012, Ronnie instructed his attorney to send a letter to Allen reminding him that he had been given a year to leave the property. He had not left the property at that time.

However, Ronnie did not file any eviction papers.

Caroline Meyer testified that she is the eldest sibling of Allen, Ronnie, and Linda. She was aware of the dispute regarding the deed. She remembered hearing Ronnie and Allen discuss not telling Debra about signing a document, but trying to get her to sign a document without her knowing what it was. Caroline testified that Ronnie took care of the family, including their mother, and that Allen was not doing well financially. She recounted a time when Ronnie came to offer her money to make up for her not receiving her acre of the property. Caroline refused to accept any money, but Ronnie told her he had given Linda $3,000.00.

Ronnie and Jennifer introduced the testimony of handwriting expert Steven Slyter. He is a forensic document examiner. Mr. Slyter examined the December 28, 2004, statement to determine whether Ronnie's signature was genuine. His opinion was that the signature on the page was not Ronnie's. The signature was significantly different than the exemplar provided because it appeared to be slowly drawn. Mr. Slyter also examined the July 1, 2004, deed to determine whether Linda's signature on the notary line was genuine. Linda had testified by deposition that this was not her signature. Mr. Slyter determined that the signature was genuine because it had all of the characteristics of her exemplars. On cross-examination, Mr. Slyter agreed that signatures may vary for various reasons, including being in a hurry.

On January 2, 2014, the circuit court entered an order setting forth its findings of fact and conclusions of law. After recounting the testimony, the court reached the following conclusions:

In this case the Plaintiff admitted that he was aware that in 2004 his brother was intending to take an additional mortgage against the entire property. The Plaintiffs were in agreement with the Defendant's intention. Instead of signing a waiver, the Plaintiffs signed a deed transferring the property to the Defendant which the Court believes was ultimately notarized by Linda Hunter. The question for the Court is whether the deed was altered by the Defendant after the Plaintiffs signed it. The Court is not necessarily convinced that the deed was altered, however the Court still believes that the Defendant committed a fraud on the Plaintiffs. Generally a contract is binding if it is signed. However there is an exception.

In *LeMaster v. Caudill* 328 S.W.2d 276 ([Ky.]1959) the Supreme Court of Kentucky allowed a claim of fraud to be presented to a jury despite the fact that the parties did not read a deed conveying their interest in property to their brother. The Court held that the parties were not on equal footing because they were relying upon the faith that their brother would not mislead them. The Supreme Court of Kentucky held that in the absence of any showing that the parties' brother had ever done anything which would cause his brothers and sisters to lose faith in him, the relationship was fiducial and they had the right to rely upon him.

In this case, the Plaintiffs and Defendants were not acting at arm's length. The Plaintiff, Allen Norwich, and the Defendant, Ronnie Norwich, are brothers who had a good relationship. The brothers have lived on the same property for most of their lives and were actively involved in the lives of the other. [They] worked and played together. The Plaintiffs trusted the Defendant. The Defendant trusted the Plaintiffs. Evidence of that trust is the mortgages taken against the property by Plaintiff

and Defendant. Plaintiffs took a mortgage against the entire real property in 1991. The Plaintiff did give some of the proceeds of the mortgage to the Defendant but a majority of the money was used by the Plaintiff. The Defendant mortgaged the real property in 2002 and 2003 with Plaintiff's approval. The Plaintiff did receive some of the proceeds of the mortgage but a majority of the money was used by the Defendant. In 2004, the Defendant once again approached the Plaintiff about mortgaging the property. Plaintiffs knew he needed the money for the education of Ms. Quammen. The Plaintiff had no objection to the mortgage. The Defendant told the Plaintiffs that they needed to sign a waiver to allow him to obtain the mortgage. The Plaintiffs agreed to sign the waiver. The Defendant presented the Plaintiffs with a document that he claimed to be the waiver. The Plaintiffs signed the document. Unfortunately it was not a waiver but a deed.

The Court was not convinced by the Defendant's testimony as to how he obtained the deed and the Plaintiff's alleged agreement to sell the property. The Defendant testified that in 2004 on the same day he spoke to the lender about a loan the Plaintiff came to the Defendant's home. The Defendant alleged that he asked the Plaintiff to sell his interest in the property for $5,000.00. He testified that he told the Plaintiff that he was going to have to move from the property within a couple of years. Within minutes, the Plaintiff agreed and minutes later a deed was faxed to the Defendant which the Plaintiff reviewed and agreed to sign. The Court found the Defendant's story not plausible. Plaintiffs have lived on this property for over 20 years. Over the years Plaintiffs have improved the property. Plaintiffs testified that they intended to live on the property into retirement. The real property and the contents on the property seem to be the only real assets owned by the Plaintiffs. The Court does not believe the Plaintiffs would sell it for $5,000.00 after giving it only a few minutes of thought.

The Court recognizes that the Plaintiffs were not completely honest with the Court. The Plaintiffs testified that after they discovered the fraud, the Defendant told them that the deed did not change anything and that they still owned the property. Then the Defendant signed a document agreeing to transfer half of the real property back into Plaintiff's name. The Court does believe that the Defendant told the Plaintiffs not to worry about the deed and that the real property belonged to each of them as it always had. However, the Court does not believe that the Defendant signed the document purporting to transfer half of the real property back into the Plaintiff's name.

The court then considered Allen and Debra's claim for punitive damages, stating its belief "that Defendant was aware that serious harm *could* result from his actions by defrauding the Plaintiffs. However, the Court is not convinced that he knew harm would result. It was always in the power of the Defendant to undo the damage by transferring the real property into the names of all of the parties." The court went on to note that while Ronnie profited from his fraud, he shared some of the profit with Allen. Allen had also agreed at the time that Ronnie could mortgage the property. Finally, the mortgage company was not going to hold Allen liable for any of the debt that Ronnie incurred. Therefore, the court did not believe that punitive damages were warranted. Similarly, the court did not find any merit in Ronnie and Jennifer's trespass counterclaim. The

court ordered Ronnie and Jennifer to execute a quitclaim deed transferring Allen's half-interest in the property back to him and dismissed the claims for punitive damages and trespass. This appeal now follows.

On appeal, Ronnie and Jennifer (now the Appellants) [2] limit their argument to whether the trial court's ruling on the forgery and fraud claim was proper. They contend that the trial court's judgment that they obtained the 2004 deed by fraud is not supported by clear and convincing evidence and is contrary to law. Allen and Debra (now the Appellees) argue that the ruling was correct as a matter of law.

 Because a bench trial was held in this case, our standard of review is set forth in Kentucky Rules of Civil Procedure (CR) 52.01:

> In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specifically and state separately its conclusions of law thereon and render an appropriate judgment; and in granting or refusing temporary injunctions or permanent injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action. Requests for findings are not necessary for purposes of review except as provided in Rule 52.04. Findings of fact, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. The findings of a commissioner, to the extent that the court adopts them, shall be considered as the findings of the court. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein. Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rule 41.02.

In *Goshorn v. Wilson*, 372 S.W.3d 436, 439 (Ky.App.2012) (footnote omitted), this Court provided further guidance:

> Because this is an appeal from a bench trial without a jury, the trial court's findings of fact are "not [to] be set aside unless clearly erroneous with due regard being given to the opportunity of the trial judge to consider the credibility of the witnesses." *Lawson v. Loid,* 896 S.W.2d 1, 3 (Ky.1995) (citing CR 52.01). Factual findings are not considered clearly erroneous if they are "supported by substantial evidence." *Gosney v. Glenn,* 163 S.W.3d 894, 898 (Ky.App.2005) (citations omitted). Appellate review of legal determinations and conclusions from a bench trial is *de novo. Id.* (citations omitted).

 In its order, the trial court relied upon *Sanford Const. Co. v. S & H Contractors, Inc.,* 443 S.W.2d 227, 231 (Ky.1969), for the elements of a fraud claim:

> We said in *Cresent Grocery Co. v. Vick,* 194 Ky. 727, 240 S.W. 388 (1922):
>
> 'We have adopted the general rule that an action cannot be maintained for fraud or deceit unless it be made to appear (1) that defendant made a material representation; (2) that it was false; (3) that when he made it he knew it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with intention of inducing

---

**2.** We note that the trial court directed a verdict in favor of Jennifer on the fraud allegation and that ruling has not been appealed. Because she was named as an appellant in this appeal, we shall continue to refer to Ronnie and Jennifer, collectively, as the Appellants.

plaintiff to act, or that it should be acted upon by the plaintiff; (5) that plaintiff acted in reliance upon it, and (6) that plaintiff thereby suffered injury.'

*See also United Parcel Service Co. v. Rickert,* 996 S.W.2d 464, 468 (Ky.1999). A plaintiff is required to prove fraud by clear and convincing evidence, a heightened standard of proof. *Hardin v. Savageau,* 906 S.W.2d 356, 357 (Ky.1995).

■■ The trial court framed the question before it as "whether the deed was altered by the Defendant after the Plaintiffs signed it." While the trial court was "not necessarily convinced that the deed was altered," it nevertheless found that Ronnie had committed a fraud on the Appellees. In so ruling, the trial court relied upon the holding in *Lemaster v. Caudill,* 328 S.W.2d 276, 280 (Ky.1959), in which the former Court of Appeals identified the existence of a fiduciary duty between the parties and explained:

> They rely principally on *Kreate v. Miller,* 226 Ky. 444, 11 S.W.2d 99, 102, where it is said:
>
> > 'One sui juris and in possession of his faculties, contracting at arm's length, and who is able to read and write, is not permitted by the law to rely exclusively upon the statements of the other contracting party as to the contents of a writing which the former signs. There must be something said or done by the party charged with the fraud which would be reasonably calculated to disarm or deceive one of ordinary prudence and to prevent him from using such diligence as [a]n ordinarily prudent man would use in the execution of a contract under the same or similar circumstances. When, therefore, the law speaks of misrepresentations by the party charged with the fraud, it means that the representa-

tions must have been not only untrue, but also made under such circumstances as would be reasonably calculated to deceive one while exercising ordinary care for his own protection.'
>
> It will be noted that in the foregoing quotation the rule announced is applicable where the parties are 'contracting at arm's length.' When we consider plaintiffs' theory of the case, certainly the parties were not on equal footing because they were relying upon the faith that their brother would not mislead them. We believe that in the absence of any showing that Prock Lemaster had ever done anything which would cause his brothers and sisters to lose faith in him, the relationship was fiducial and they had the right to rely upon him. This issue was submitted by the instructions.

Because of the close relationship between Ronnie and Allen and the parties' past history of mortgages on the property that Ronnie coordinated, the trial court found that the parties were not acting at arm's length. Rather, the Appellees trusted Ronnie to be truthful with his dealings and protect their interests.

The Appellants first argue that the evidence does not support a conclusion that the 2004 deed had been altered. The trial court agreed, holding that it was not "convinced that the deed was altered[.]" Therefore, we need not address this argument because the trial court did not rule in this fashion.

■ In their second argument, the Appellants contend that the evidence does not support the conclusion that Ronnie had committed a fraud in any other manner. They assert that the Appellees' entire claim was based upon the allegation that the deed had been altered; the Appellees testified that they had signed a waiver and that the additional writing from the signa-

ture lines down, including the notary and attorney information, was added after they had signed the document. Because the evidence did not establish that the deed had been altered, the Appellants argue that the Appellees' testimony, as well as Linda's testimony, supports that they would have carefully reviewed the document before signing, establishing that all parties involved knew that the document being signed was a deed, not a mere waiver. The Appellees, on the other hand, contend that they had met the elements of the fraud cause of action through clear and convincing evidence and that there was substantial evidence in the record for the court to believe their version of the events over Ronnie's version. We agree with the Appellees.

First, we hold that substantial evidence supports the trial court's conclusion that Ronnie's version of events was not plausible, including the communications with the mortgage company and Allen's quick decision to sell his interest in the real estate for $5,000.00 with the knowledge that he would have to move soon. Allen's mobile home was not capable of being transported due to its age, and he and Debra had expended funds to improve both the property and the mobile home. Likewise, the witnesses disputed Ronnie's testimony regarding the signing of the witness statement, which Ronnie did not produce, and the deed.

Next, and as set forth in the Appellees' brief, we hold that the Appellees established the six elements of their fraud claim by clear and convincing evidence, despite the trial court's holding that it was not convinced that the deed had been altered: 1) Ronnie made a material misrepresentation to the Appellees that they were signing a waiver to permit him to mortgage the property, not a deed; 2) Ronnie's statement that the document was a waiver was false; 3) Ronnie knew his statement was false because he knew that the Appellees were signing a deed, not a waiver; 4) Ronnie made the representation with the intention of inducing the Appellees to act, i.e., sign the document; 5) the Appellees relied upon Ronnie's material representation by taking his word that they were signing a waiver and signed the document as they had done in the past; and 6) the Appellees were injured as a result because they transferred their interest in the land to the Appellants when their mobile home could not be moved and it would cost them considerable money to purchase land and relocate their residence. When considered in conjunction with their family relationship and past business dealings related to the real property, we hold that the trial court did not commit any error in concluding that Ronnie had committed fraud.

For the foregoing reasons, the January 2, 2014, order of the Campbell Circuit Court is affirmed.

ALL CONCUR.